Lynn L. CHARLSON and Beryl W. Charlson

v.

The UNITED STATES.

No. 176–71.

United States Court of Claims.

Nov. 19, 1975.

Bert B. Rand, Washington, D. C., atty. of record, for plaintiffs; Hans A. Nathan, Washington, D. C., of counsel.

Robert N. Dorosin, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Robert H. McKnight, Jr., Washington, D. C., of counsel.

Before SKELTON, KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiffs' motion filed July 16, 1975, requesting that the court adopt the recommended decision of Trial Judge Joseph V. Colaianni, filed June 3, 1975, pursuant to Rule 134(h), as the basis for its judgment in this case since defendant has failed to file a notice of intention to except thereto and the time for so filing pursuant to the rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiffs are entitled to recover $32,012.56 for 1961; $56,211.67 for 1962; and $66,274.81 for 1963, along with interest for each of the years as provided by law from the date of payment, and judgment is entered for plaintiffs accordingly.

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge: This is a tax refund suit that arises as a result of Mr. Charlson's disposition of patents [1] to a corporation which was formed for the specific purpose of exploiting them. The question is whether the amounts received by plaintiffs in 1961, 1962 and 1963 from the Germane Corporation were taxable as long-term capital gains as reported on plaintiffs' joint federal tax return, or as ordinary income as defendant contends. The parties have stipulated that if plaintiffs prevail they are entitled to recover $32,012.56 for 1961, $56,211.67 for 1962, and $66,274.81 for 1963, along with interest as provided by law from the date of payment. For reasons hereinafter set forth, it is concluded that plaintiffs are entitled to judgment against the defendant for a refund of taxes in the amounts stipulated.

### Background Facts

The facts are fully detailed in the findings of fact which accompany this opinion and will be repeated only to the extent necessary to an understanding of the result reached.

In about 1942, plaintiffs, as partners, purchased the assets of a bankrupt Minneapolis, Minnesota, machine shop. In early 1946, plaintiffs incorporated their business as the Char-Lynn Company. Plaintiffs and their daughter, Mrs. Donna Herzog, were for all relevant times the only shareholders of the corporation. Mr. Charlson is a self-educated engineer and businessman who served as president and the guiding light of Char-Lynn. During the early years, plaintiffs' business was primarily a machine shop specializing in die-casting. While operating as a machine shop, the business grew from annual sales of approximately $500,000 in 1950 to $2,900,000 by 1958. Char-Lynn employed 120 persons in 1958.

Notwithstanding its growth, Mr. Charlson recognized the need for Char-

---

1. Although Mr. Charlson disposed of a number of patents and applications in the same transaction, United States Letters Patent No. 2,821,-

171, entitled "Fluid Pressure Device and Valve," is by and far the most important one.

Lynn to develop a unique product line if it was to be successful. Accordingly, Char-Lynn purchased a patented pneumatic tire spreader which it redesigned and marketed until 1949. In the early 1950's it manufactured and marketed a power pack. In 1954 or 1955 Mr. Charlson conceived, and later patented, a hydraulic valve device. Production of the device did not begin until about 1957.

As a result of his continuing search for a unique product line, Mr. Charlson became aware of the market potential for a high-torque, low-speed hydraulic motor. Mr. Charlson sought the assistance of various hydraulic experts to design and develop such a motor, but was told that such a motor did not exist and could not be built. Charlson decided to pursue the design on his own and, after considerable reflection, in late 1955, conceived his idea for a high-torque, low-speed motor. As conceived, the motor's key components consisted of a rotatable gerotor and a commutator valve mechanism for orbiting of the gerotor. He discussed his conception with a Mr. Harold Darr, the owner of an independent engineering consulting firm, who had assisted Mr. Charlson in the past on other projects. After considerable analysis and study, Mr. Darr concluded that the conception was sound and proceeded to build a model. Following some modifications and refinements in the design, the orbit motor was successfully reduced to practice.

A patent application on the invention was prepared and filed in the Patent Office on June 8, 1956. United States Letters Patent No. 2,821,171 issued in the name of Lynn L. Charlson on January 28, 1958.

Upon learning in October of 1957 of the eventual allowance of a patent on his orbit motor invention, Mr. Charlson gave serious thought to evaluating the commercial application and potential of the orbit motor. After discussions with Mr. Darr, who personally made inquiries regarding exploitation of the motor patent with companies active in the fluid power field, Mr. Charlson decided to sell his orbit motor patent when it issued. Mr. Charlson's decision to sell his patent was based on a variety of considerations, including: a desire to keep the patent, insofar as his estate was concerned, an independent business asset isolated from any possible business reversal which Char-Lynn might suffer; a concern that Char-Lynn's limited capabilities could not adequately exploit the patent; a desire not to increase his already heavy workload at Char-Lynn; and his fear of having to include the patent in any future sale he might make of Char-Lynn.

Having decided to sell his patent, Mr. Charlson next considered the various sale options open to him. He was obviously interested in obtaining the best and highest price from a purchaser who would be monetarily motivated to exploit the full potential of the patent. Mr. Charlson was aware that the newly patented motor did not have proven applications or marketability, and was quite revolutionary in design. Thus, he did not feel that a large manufacturing company or a professional patent licensing company would offer him a fair price. He also feared that a large company might agree to purchase the patent and then not properly exploit it. The record does not indicate that he ever considered or approached any medium-size companies.

Mr. Charlson decided to sell to a group of his business associates and personal friends, and in early 1958 approached Ward B. Lewis, Esq., Char-Lynn's corporate counsel, his own personal attorney, and his long-time friend, to determine if he and three other individuals would be willing to form a new corporation to purchase his patents. The three others consisted of Mr. Harold Darr, who in 1959 was still a consulting engineer but would, after suffering a heart attack, become a full-time employee of Char-Lynn in 1964; Mrs. Beverly Scott, who was at the time a highly valued and trusted administrative assistant to Mr. Charlson at Char-Lynn; and Mr. Ray-

mond O. Jensen, who had been a friend of Mr. Charlson and an employee of Char-Lynn for many years and was then serving as its comptroller.

The above individuals, in addition to being trusted, long-time business associates of Mr. Charlson who had each, in his own way, contributed to the growth of Char-Lynn, were suggested by Mr. Charlson because each possessed diverse business talents. Specifically, Mr. Lewis had proven legal experience; Mr. Darr had engineering and design capabilities; Mrs. Scott had administrative and coordinating experience; and Mr. Jensen had a good business background. At the time he approached them, Mr. Lewis explained that there would be no restrictions or limitations of any kind on the new corporation's ownership of the Charlson patents.

The four, partly because of their friendship with Mr. Charlson and partly because they thought it could prove to be monetarily rewarding, agreed to form the Germane Corporation to purchase the Charlson patents.

Each of the four shareholders paid for their own 300 shares of stock at the stated price of $1.00 per share. Mr. Charlson did not lend nor give any of the incorporators money to cover the purchase of their 300 shares of Germane stock. No other Germane stock beyond the initial 1,200 shares was issued during its entire existence. These individuals, except in the case of Mr. Lewis, who shortly after issuance of the stock transferred it to Mrs. Lewis, were the only shareholders of Germane during its entire existence.

Germane's certificate of incorporation issued on September 2, 1958. At the time of incorporation, Mr. Raymond O. Jensen was Germane's president; Mrs. Beverly Scott was vice-president and secretary; Ward B. Lewis, Esq., was vice-president and assistant secretary; and Harold N. Darr was treasurer. The above individuals constituted the only directors and office-holders of the corporation throughout its entire existence, except for Mr. Darr, who died in 1967. Upon the death of Mr. Darr, Mr. Jensen took over the position of treasurer while remaining as Germane's president. Neither Mr. Charlson nor any member of his immediate family was ever an officer or director of Germane. Mr. Charlson never attended any of the meetings of Germane's board of directors. Moreover, he was not an incorporator of Germane and never owned any shares of that company. The record does not show and defendant does not contend that Mr. Charlson made any loans to the officers or directors of Germane.

After the formation of Germane, Mr. Lewis, as Germane's representative, and Merchant & Merchant, an independent patent law firm as Mr. Charlson's representative, drew up a patent sales agreement to transfer all of Mr. Charlson's rights, title and interest to his various patents and patent applications to Germane. Mr. Charlson did, however, retain his right to:

(1) inspect samples of orbit motors made by any of Germane's licensees and make recommendations for quality control purposes;

(2) cancel the contract upon Germane's failure to make the agreed to payments; and

(3) bring patent infringement suits in conjunction with Germane, but without the right to control the action.

In exchange, and as consideration for the transfer of all rights, title and interest to the various Charlson patents and applications, Germane promised to pay Mr. Charlson 80 percent of all royalties it received from the licensing of the various patents. Germane was to receive 20 percent of the royalties. The 80/20 percent arrangement was substantially similar to other arm's-length patent sale agreements.[2]

2. In *Van Dale Corp.*, 59 T.C. 390, 396 (1972), the patent sale agreement provided for the owner to receive 90 percent of the royalties earned by the patents while the purchasing company was to retain 10 percent. The court, commenting on this agreement, states:

Concurrent with the execution of the sales agreement, Germane granted Char-Lynn a nonexclusive license to make and use devices covered by the patents and patent applications in the United States and to sell them throughout the world. Char-Lynn manufactured approximately 100 motors in 1958. It increased its production in 1959 to about 1,000 motors. Some 1,500 motors were produced by Char-Lynn in 1960. Production doubled over the succeeding years so that by 1965 Char-Lynn produced about 80,000 units. The number increased to 120,000 for 1966 and approximately 200,000 by 1970. As a result of this growth, the orbit motor had, by 1965, become Char-Lynn's most important product. In terms of dollars, the sales of the hydraulic motors increased from $177,796 in 1960 to $7,409,529 in 1968. Moreover, by 1970 Char-Lynn's total sales amounted to approximately $19,900,000 and it employed some 600 persons.

Germane also granted other licenses. In 1961, Danfoss A/S, a Danish corporation, was granted an exclusive license to make, use and sell devices covered by the patents in Europe. The granting of an exclusive license to Danfoss required Char-Lynn to give up its right to sell its motors throughout the world. The record clearly demonstrates that Char-Lynn had not by 1961 established a worldwide program to sell its orbit motors and it was thus willing to give up its unexercised rights. Danfoss' need for technical assistance in setting up its production facilities for the orbit motor, and, as well, its need for an immediate supply of motors until it had the opportunity to tool up and establish its own production lines, required the assistance of both Mr. Charlson and Char-Lynn during the negotiations of the Danfoss A/S license. Germane was represented by Mr. Lewis during the negotiations.

Germane also granted an exclusive license in 1961 to Moore Hydraulics Pty., Ltd., of Australia, hereinafter referred to as "Moore." The license granted Moore the exclusive right to make, use and sell orbit motors in Australia and New Zealand. It appears that sales of the motors in that area did not materialize to the point where Moore could justify the tooling up costs required to produce the motors in Australia, and thus Moore has been satisfied to purchase motors from Char-Lynn for resale in its licensed area. During the license negotiations with Moore, Mr. Jensen represented Germane. Mr. Charlson and Char-Lynn attended the negotiations.

In the early 1960's, Ross Gear Company had expressed an interest in obtaining a license under the Germane patents. However, as a result of Ross' refusal to pay Germane a standard 5 percent royalty, the license negotiations failed. Ross, nonetheless, went on to manufacture a steering device for off-the-highway equipment, which Char-Lynn's sales engineers felt infringed the orbit motor patent. As a result, a patent infringement suit was jointly brought by Germane, Char-Lynn, and Mr. Charlson against Ross Gear and its successor in interest, TRW, Inc. The infringement suit was settled by a cross-licensing agreement executed on August 2, 1966, which, in accordance with the terms of the agreement, granted TRW, Inc., a nonexclusive license to manufacture and sell orbit motors for use in a power steering system of specific design.

The only other Germane licensee was Lamina, Inc., hereinafter referred to as "Lamina," a Michigan corporation whose principal business in the early 1960's was the manufacture of lamination dies for the electrical motor industry and the manufacture of bronze bushings and wear plates for the machine tool indus-

"We note first that respondent has not contended that the consideration paid by NSP to acquire the patents was less than what would have been paid by a corporation with no ties at all to petitioner. In fact, the terms existing between petitioner and NSP [NSP to receive 90 percent of the royalties earned and plaintiff to retain 10 percent] were basically identical to those offered by University [another patent holding company] to acquire petitioner's patents."

try and the general die industry. Lamina became interested in the orbit motor as a result of its work toward the development of a transportable, powerful drilling apparatus for use in restricted areas. The orbit motor was ideally suited for such an assignment because it did not need a separate speed reduction unit, such as was required by electric motors. As a result, on April 3, 1964, Lamina was granted an exclusive license to manufacture the patented orbit motor provided that the main motor shaft was equipped with a permanently-affixed device (such as a chuck or collet) adapted to hold tools for rotary machining operations.

By subsequent negotiations, the parties ultimately agreed to a broader 1967 agreement in which Germane granted Lamina a nonexclusive license to sell the orbit motor to the machine tool industry.

A review of the licensees indicates that Char-Lynn's operations were the broadest in scope. This is evident from the fact that two of the licensees were exclusively foreign based. Particularly, Danfoss operated solely in Europe, while Moore Hydraulics bought motors from Char-Lynn for resale in Australia and New Zealand. The Ross Gear Division of TRW was authorized to use the orbit motor in connection with a power steering system of a specific design. Only Lamina, with its license to sell the motor to the machine tool industry, provided potential competition to the orbit motors made and sold by Char-Lynn.

In late 1968, Mr. Charlson, for reasons of health, decided to sell Char-Lynn. He did not inform any of the German stockholders of his decision, but Mrs. Scott, as a result of her employment at Char-Lynn, learned of this decision in August of 1970. In the meantime, by late 1969, the shareholders of Germane had independently, and without knowledge of Mr. Charlson's intentions, decided to sell either the Germane stock or its assets, i. e., its patents. Germane's decision was based on a variety of considerations, including:

1. The shareholders had aged and wanted to divorce themselves of these additional responsibilities;

2. Mr. Darr had died and that left only three directors, none of whom was technically competent, to make all of Germane's decisions; and

3. The patents had proved to be of great value and their successful exploitation was beyond Germane's fairly amateur capabilities.

Germane did not inform Mr. Charlson nor any of its licensees of its decision to sell. Instead, it hired an independent patent attorney, Dan Stice, Esq., who was active in the licensing of patents, to arrange a sale. As a result of Mr. Stice's efforts, on June 30, 1970, Messrs. Lewis and Stice visited the Eaton Corporation in Cleveland, Ohio. They met with two Eaton patent attorneys, who informed them of Eaton's interest in the Germane patents.

During this period of time, Mr. Charlson was engaged in serious negotiations for the sale of Char-Lynn stock with several companies, including the Sperry Rand Company. A sale of Char-Lynn to Sperry Rand was imminent when Eaton, who was then negotiating with Germane, approached Mr. Charlson about buying Char-Lynn. Eaton notified plaintiff and his counsel, Bert B. Rand, Esq., that it had already been approached by Germane, and that it was interested in purchasing the Germane patents.

As a result of the discussions, Eaton made an offer to buy Char-Lynn which was better than Sperry Rand's offer. In addition, Eaton agreed to pay Mr. Charlson 8 million dollars ($8,000,000) for all of his right, title and interest in the balance of the purchase price due him from Germane under the patent sales agreement. Eaton could have refused to close with Germane if its negotiations with Mr. Charlson involving the sale of his residuary rights were unsuccessful. On December 28, 1970, the sales between Eaton Corporation and Germane and between Eaton Corporation and Mr. Charlson were consummated. Each party to

these transactions was represented by independent counsel of its own choice.

For at least the years in question, 1961 through 1963, inclusive, plaintiffs computed their federal income tax and filed their returns on the premise that the payments they received from Germane in consideration for the transfer of the Charlson patents and applications were taxable as capital gains. On audit, the Internal Revenue Service determined that the payments were not entitled to capital gains treatment and assessed deficiencies accordingly. Plaintiffs paid the assessments and upon formal disallowance of their timely-filed claims for refund, brought this action.

### Issues

Defendant argues that the royalty payments from Germane to Mr. Charlson under their patent sales agreement are ordinary income rather than capital gains, because, for the purposes of 26 U.S.C. § 1235, Germane is a sham corporation and/or controlled by Mr. Charlson. Plaintiffs, on the other hand, contend that the royalties they received are entitled to capital gains treatment under 26 U.S.C. § 1235 since Mr. Charlson exercised no control over Germane and since Germane was an independent corporation which conducted its own business to advance its own interests without outside intervention or interference. Each of defendant's contentions will now be considered.

### Germane was not Controlled by Mr. Charlson

Section 1235, which deals with the sale or exchange of patents, provides in pertinent part:

(a) *General.*—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights

to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

\*　　\*　　\*　　\*　　\*　　\*

(d) *Related persons.*—Subsection (a) shall not apply to any transfer, directly or indirectly, between persons specified within any one of the paragraphs of section 267(b); except that, in applying section 267(b) and (c) for purposes of this section—

(1) the phrase "25 percent or more" shall be substituted for the phrase "more than 50 percent" each place it appears in section 267(b), and

\*　　\*　　\*　　\*　　\*　　\*

Thus, 26 U.S.C. § 1235 does not speak in terms of sham or controlled corporations. Instead, § 1235(a) confers capital gains treatment on a "transfer \* \* \* of property consisting of all substantial rights to a patent \* \* \* by any holder \* \* \*." However, § 1235(d) denies such treatment to transfers, "directly or indirectly," [3] between certain related persons. In particular, a corporation in which the holder owns more than 25 percent in value of the outstanding stock, directly or indirectly (with 26 U.S.C. § 267(c) attribution rules applying), is a related person under § 1235(d).

It is clear from the facts and not disputed by defendant that Germane is not related to Charlson within the *literal* meaning of 1235(d). Nor has defendant

---

**3.** This phrase was made a part of 26 U.S.C. § 1235(d) as a result of an amendment effective September 3, 1958. The patent sales agreement, although executed about September 25, 1958, was effective January 28, 1958, when an oral agreement between the parties was reached. This intervening amendment does not affect the analysis of plaintiff's liability, since, for reasons stated in *Myron C. Poole*, 46 T.C. 392 (1966), the amendment is simply declaratory of prior law.

suggested that any of the rules or guidelines which define "related persons" be interpreted to cover the situation at bar. Indeed, any such interpretation would be directly contrary to the manner in which the statute has been previously applied. In *Lee v. United States*, 302 F.Supp. 945 (E.D.Wis.1969), the holder owned 24 percent of the stock of the transferee corporation but was still found to be entitled to capital gains treatment. *See also B. J. Semel*, 33 CCH Tax Ct. Mem. 248 (1974), a case involving 26 U.S.C. § 1239, in which the court applied the 80 percent rule literally. Thus, even assuming that Germane was a controlled corporation, it would still be necessary to demonstrate that the § 1235(d) requirements existed in order to conclude that Germane was "related" to Mr. Charlson.

■■■ Nevertheless, it is equally clear that retention of control by a holder over an unrelated corporation can defeat capital gains treatment, if the retention prevents the transfer of "all substantial rights." This is because the holder's control over the unrelated transferee (within the meaning of § 1235) places him in essentially the same position as if all substantial rights had not been transferred. The purpose and policy of § 1235(a), as expressed in the legislative history, provides support for such an interpretation. Specifically, with the obvious intent of having a transferor's acts speak louder than his words in establishing whether a sale of a patent has occurred, the Senate Finance Committee stated:

> * *' * [i]t is the intention of your committee to continue this realistic test * * * developed under prior case law * * *, whereby the en-

tire transaction, regardless of its formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee,,rather than recognizing the less relevant verbal touchstones * * * in the transfer agreement * * *.[4]

*See also Oak Mfg. Co. v. United States*, 301 F.2d 259 (7th Cir. 1962), where the court concluded that retention of control over substantial rights by the transferor rendered the "sale" an agency agreement, which contemplated a continuing relation rather than a bona fide sale and release of rights. It should be stressed that § 1235(d) was not intended to be an exclusive or exhaustive statement of the impact of control over a § 1235(a) transaction, even though the concept of related person is essentially based on control.[5]

Both sides rely on *Puschelberg v. United States*, 330 F.2d 56 (6th Cir. 1964). In that case, Puschelberg and a joint inventor were awarded a patent for a disposable blood filter. They, in turn, granted Baxter Laboratories, Inc., an independent ethical pharmaceutical house in the drug industry, an exclusive license under the patent. Baxter at the same time gave Puschelberg's company ("Fabricated") a nonexclusive license to manufacture the filters which Baxter would buy from it at a set price. The sales agreement also provided that if Baxter licensed anyone else, a percentage royalty based on sales would be paid to the co-inventors. The Government in that case argued that Puschelberg and his co-patentee did not transfer "all substantial rights to * * * [the] patent" to Baxter as is required by 26 U.S.C. § 1235(a),

---

4. S.Rep. No. 1622, 83d Cong., 2d Sess., pp. 439–40 (1954), U.S.Code Cong. & Admin. News, 1954, p. 5083.

5. *Id.*, pp. 440–41, U.S.Code Cong. & Admin. News 1954, p. 5084, and H.R.Rep. No. 1337, 83d Cong., 2d Sess., p. A280 (1954), U.S.Code Cong. & Admin.News, 1954, pp. 4422, 4423:

"* * * The sale of a patent between an individual and a corporation more than 50 percent in value of the outstanding stock of which

is owned, directly or indirectly, by or for such individual would not * * * be entitled to capital gain treatment under this section. It is not considered that this limitation will in any way narrow the opportunity of inventors to dispose of their patents through normal business channels; on the other hand, this limitation should prevent possible abuses arising from the sale of patents within *essentially the same economic group*." [Emphasis added.]

but that Puschelberg and the co-patentee retained substantial manufacturing rights. The facts in *Puschelberg* indicate that Baxter only granted one license, and that was to Puschelberg's corporation, Fabricated. However, Baxter did have the right to grant as many licenses as it desired. The Sixth Circuit was unpersuaded that any tacit agreement or retained control existed and held that the co-patentees had disposed of all their rights under the patent.[6] Specifically, the court stated, at p. 61:

> We do not so construe the agreement. Baxter clearly acquired the right to manufacture the filters under the agreement. The agreement also gave Baxter the right to have the filters manufactured for it. This did not confer upon the taxpayer any right to manufacture the filters, but merely authorized Fabricated to manufacture the filters if Baxter asked it to do so. The District Judge found that it was the understanding of both of the contracting parties that in executing the license agreement, the co-inventors were disposing of all their rights to the invention.

*Puschelberg* involves a legal question which is quite similar to that which defendant presents in this case. However, the case at bar is factually distinguishable from *Puschelberg*. Baxter Laboratories was a large, independent, well-established Delaware corporation. There was no showing that the co-inventors and Baxter had ever had any prior dealings. The assignment to Baxter and the non-exclusive license back to Fabricated were arm's-length transactions. Moreover, the fact that Baxter did not have a need for more filters than Fabricated could produce provided a business justification for Baxter's issuing only one license. These facts are contrasted with the facts in the case at bar where close personal friendships and business association between Mr. Charlson and Darr, Scott, Jensen, and Lewis existed for many years prior to the formation of Germane. And although neither Darr, Scott, Jensen, nor Lewis was related in any sense to Charlson, each had either worked for Mr. Charlson or Char-Lynn at some time. These circumstances make more probable, whether pursuant to some mutual understanding or not, the existence of retained control.

However, this probability falls far short of proof. Indeed, the record shows that in late 1957 the main Charlson patent was just about to issue and plaintiff felt that he was at a disadvantage in trying to negotiate a sale of an unproven product at the highest price with the larger companies. Mr. Charlson, for the very same reason, feared that the larger companies would not proceed with the full exploitation of the patent. On the other hand, Mr. Charlson felt that Germane would be fair to him.

The explanation for his decision against either selling the patents to Char-Lynn [7] or having Char-Lynn manufacture the motor under a license from him appears in the trial record. Particularly, the record clearly establishes Mr. Charlson's desire to reduce his workload at Char-Lynn. Mr. Charlson also explained his suggestion of Darr, Scott, Jensen, and Lewis as shareholders in Germane by the fact that they all possessed skills valuable to a small, new patent licensing corporation. However, it is also apparent that the choice of shareholders was greatly influenced by Mr. Charlson's friendship with these peo-

**6.** Indeed, the court agreed with the District Court's conclusion that all substantial rights under the patent, as defined by *Waterman v. MacKenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891), were transferred and that, accordingly, an assignment of the patent had taken place.

**7.** Char-Lynn at the time of sale in 1958 was partially owned by Charlson's daughter. It

was Charlson's impression then that with a timely gift of stock to his daughter, Char-Lynn would become unrelated to him for purposes of capital gains treatment on a sale. Whether or not this impression is actually correct does not matter. Charlson's belief in it shows that he thought he had a viable choice to make and lends credibility to his given reasons for a sale to Germane.

ple and his thought, no doubt present, that they would be less likely to do things adverse to his interests than a large unknown company would.

The trial record as a whole did not show that Mr. Charlson controlled the operation of Germane. While he or a Char-Lynn representative was present at various stages of some of the negotiations between Germane and the other licensees, this presence is explainable on the basis of either Char-Lynn's interest as a manufacturer and licensee or of Charlson's own monetary interest in seeing that the best licensees were selected. Char-Lynn's interest resulted from its sale of motors to Danfoss, Moore Hydraulics, and even Lamina for varying times until each could develop its own manufacturing facilities. In addition, Char-Lynn and Mr. Charlson were joint plaintiffs, along with Germane, in the Ross Gear infringement suit. Char-Lynn obviously did not want the scope of its license adversely affected by the sale of motors by the others contrary to the terms of their licenses. Charlson's participation in the licensing negotiations was advantageous to Germane because as the inventor he could explain the technical difficulties and advantages of the motor to the prospective licensees, and otherwise generally be of aid to Germane in obtaining good licensing terms. It obviously was to Germane's and Mr. Charlson's mutual advantage to obtain as high a royalty as possible because of their respective rights to 20 percent and 80 percent of the royalties collected from the licensees.

The record clearly shows that Charlson, Char-Lynn, and Germane operated quite effectively as a group and were solicitous of each other's individual interests as well as their mutual interests, of which the financial success of the motor was by far the most important.

■ Finally, the patent sales agreement itself does not contain any terms which can be pointed to as evidence of Mr. Charlson's control or domination of Germane. Charlson never exercised his retained right to supervise quality control procedures in such a way as to eviscerate Germane's rights, as owner of the patent. Nor has defendant pointed to anything which shows that Mr. Charlson and not Germane decided the terms of the various license agreements. Indeed, the record does not establish that Mr. Charlson exercised what have come to be recognized as proprietary acts over the transferred patents. *William W. Taylor,* 29 CCH Tax Ct. Mem. 1488 (1970). The right of Charlson to terminate the license for nonpayment of the royalties is not a substantial retained right, *Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 180 Ct.Cl. 1071 (1967), *Arthur M. Young,* 29 T.C. 850 (1958), and does not suggest on the facts of record a retention of control through use of a threat to terminate. The inventor-transferor's right to bring infringement suits in conjunction with the patent purchaser is likewise not a substantial right in the absence of the additional right to control and direct the suit. This control is especially critical where the transferor's compensation for his patent is calculated on a royalty-use percentage basis. *Oak Mfg. Co. v. United States, supra.* In this case, Mr. Charlson did not have the right to control or direct infringement suits. Certainly, defendant has not pointed to any action by Mr. Charlson in connection with the Ross Gear infringement suit, which was brought by Germane, Mr. Charlson and Char-Lynn, that would support any charges of control over that suit by plaintiff.

■ In summary, although the many and varied business and personal relations between the shareholders of Germane and Mr. Charlson were such that they would make any patent sales arrangement between them highly conducive to the exercise of impermissible control by the transferor over the transferee, the proof of record fails to support defendant's charges. While such control was easily possible, the plaintiff has adequately demonstrated that it did not in fact exist. The defendant has failed to

present facts to substantiate its allegation of control. By the patent sale agreement, Charlson transferred all substantial rights in his various patents and applications to Germane. Germane exercised these rights according to its own discretion, although it frequently sought, received, and followed the recommendations of Charlson.

Defendant's argument that Germane's license program is also evidence of Mr. Charlson's control and domination of Germane will next be considered. As previously mentioned, the licensees, Danfoss and Moore, were exclusively foreign based and thus provided no competition to Char-Lynn's operations in the United States. The license to the Ross Gear Division of TRW, for a particularly designed power steering system, similarly did not offer much competition to Char-Lynn. Only the license to Lamina, which authorized the sale of orbit motors to the machine tool industry, could in theory compete with Char-Lynn. It should first be recognized that Char-Lynn did indirectly benefit from some of the above licenses since it was called upon to supply orbit motors for the licensees until they were able to set up their own production facilities. However, this small indirect benefit hardly establishes defendant's charge.

To the contrary, it was explained that a desired licensee, one with adequate financial backing and of medium size, never appeared and requested a license. Moreover, the trial record establishes, without contradiction by defendant, that a deficiency of a key component, the gerotor, of the orbit motor seriously limited the total number of motors which could be produced. Particularly, the record establishes that each of the licensees, with the possible exception of Danfoss, purchased gerotors from the Nichols Company. Although various efforts were made to both develop a second source and to have the Nichols Company expand its production (which was eventually done), a serious shortage of gerotors remained throughout Germane's existence. The thrust of the uncontradict-

ed testimony at trial established, because of the shortage of gerotors, that the granting of additional licenses would only result in a large number of licensees making the same number of orbit motors. Thus, there would not be an increase in the amount of royalties that Germane could collect and under these circumstances there was no incentive for it to actively seek licensees.

A review of *Myron C. Poole,* 46 T.C. 392 (1966), indicates that factors which are not present in the case at bar convinced the Tax Court of plaintiff-Poole's nonentitlement to capital gains treatment for monies received from Revolvex. In *Poole,* the inventor of the rotating mobile home window "sold" his patent to the Revolvex Corporation, a company which conducted substantial business activities in the sense of *Moline Properties v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), but which Poole completely dominated and controlled. The facts in that case show that Poole was president of Revolvex and owned 50 percent of the stock outright with a substantial portion of the remainder being constructively held for him. Poole also owned 80 percent of the outstanding stock of Ventoura Corporation. Ventoura actually manufactured mobile homes with rotating windows. Revolvex, which purportedly purchased the patent, licensed Ventoura on a nonexclusive basis. Thus, at times Poole signed both parts of two-party agreements between Ventoura, Revolvex and Poole; one part as president of Revolvex, and the other part as Poole, the inventor, or as Poole, the president of Ventoura Corporation. The Tax Court found that:

> The terms of these contracts were such that Revolvex could never earn any significant income; it was merely a conduit to pass the royalties through to Poole. [46 T.C. at 404.]

In addition, Poole admitted to having Revolvex cancel the license of its only other licensee when he felt it was in the best interests of Ventoura to have an exclusive license. Thus, the court concluded that " * * * Poole used his

control of Revolvex in such a way as to enhance the profits of Ventoura—but not so as to make profits for Revolvex." Accordingly, using the "doctrine of step transactions," whereby—

> * * * the tax consequences of a series of transactions are ascertained, not from the form of each transaction, but from a comparison of the economic realities at the beginning and at the conclusion of the series * * * [46 T.C. at 402]

the Tax Court held that:

> * * * the transfer of patents from Poole to Revolvex was not a transfer to an unrelated person, as contemplated by section 1235, because it was, in substance, an indirect transfer to Ventoura, a related person. The patents remained within essentially the same economic unit and subject to the holder's [Poole's] control. [46 T.C. at 403.]

In the instant case, Mr. Charlson had no interest, stock or otherwise, in Germane. Moreover, there has been no showing that Germane deliberately limited the number of licenses to benefit Mr. Charlson and/or Char-Lynn. Indeed, Germane's ownership over the patents is evidenced from its sale of the same to Eaton Corporation after apparently taking into consideration only what was most advantageous to Germane and its shareholders.

On balance, it is concluded that the 12-year business arrangements between Germane, Char-Lynn, and Mr. Charlson were cordial and founded on long-established friendships, as well as upon mutually beneficial business interests. The dealings between the parties may have deviated appreciably from the standard business model of self-interest, coercive bargaining, and partisan frictions which the Government impliedly urges as the appropriate standard for comparison. Nonetheless, the disposition of Charlson's patents and applications to Germane, since it did transfer all of his substantial rights under his patents and applications

to Germane, was not a sale of patents within essentially the same economic group and does qualify under 26 U.S.C. § 1235 for capital gains treatment.

### Germane was not a Sham Corporation

In addition to defendant's argument that Germane was controlled by plaintiff, defendant also urges that Germane was a sham corporation and I now turn my attention to consider the merits of this latter contention. Defendant's sham corporation argument requires an approach which is fundamentally different from its "control" argument. Under the "control" argument, defendant in effect admitted the existence of Germane but insisted that it was controlled by Mr. Charlson and that no substantial rights of Charlson, within the meaning of 26 U.S.C. § 1235, were transferred to Germane under their patent sale agreement. On the other hand, under the sham corporation argument, defendant not only does not, for tax purposes, concede the existence of Germane, but, to the contrary, denies its very existence. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); *Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940); *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

Accordingly, defendant must now urge that all of Germane's activities, including the licenses it granted, were for all intents and purposes actually conducted and/or awarded by its individual shareholders operating as a noncorporate group. Fleshing out defendant's sham theory, it follows that royalties received by the noncorporate group would be taxed at a rate dictated by the various individual licenses. Specifically, receipts from a nonexclusive license would be treated as ordinary income, while royalties from an exclusive license, which could perhaps qualify as a sale, might be entitled to long-term capital gain treatment.[8] *See Estate of Klein*, 507 F.2d

---

8. Provided, of course, that the noncorporate group could meet the conditions of 26 U.S.C. § 1221, or § 1235.

617 (7th Cir. 1974), *rev'g* 61 T.C. 332 (1973), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975); *First Nat'l Bank of Princeton v. United States,* 136 F.Supp. 818 (D.N.J.1955); *Vincent A. Marco,* 25 T.C. 544 (1955).

█ A threshold problem which defendant's sham theory encounters is its relevancy, for tax purposes, to Mr. Charlson. Indeed, the sham theory, if it is to have any vitality, must be grounded on the proposition that Mr. Charlson, as the inventor and holder of the patents, was a member of the noncorporate group which granted the licenses to Danfoss, Moore, Char-Lynn, the Ross Gear Division of TRW, and Lamina. The fallacy of defendant's theory becomes evident after a moment's reflection because even assuming that Germane is a sham corporation, Mr. Charlson is still entitled to § 1235 benefits so long as Germane is not a related or controlled sham corporation. In other words, under § 1235, Charlson can sell either to a sham or a bona fide corporation but he cannot sell to a controlled or related sham or to a controlled or related bona fide corporation. Thus, showing that Germane is a sham, without showing that Charlson is a member of the noncorporate group that remains after the corporate facade has been stripped away and without showing that the group runs afoul of the conditions of § 1235(d), will not suffice to deprive Charlson of the capital gains benefits afforded by that section.

In this case, it is clear that Charlson was not a member of the Germane group, even though it was stated heretofore that Germane, Char-Lynn and Mr. Charlson operated quite effectively together. It has previously been amply demonstrated that Charlson did not control Germane's activities or dictate its acts. It is, of course, recognized and acknowledged that by itself, lack of control does not establish lack of membership in the group under consideration. Indeed, Charlson could have been a member of the group without controlling it. However, the evidence of record fails to establish that Mr. Charlson was a member of a noncorporate group which owned and controlled his patents. To begin, defendant has not shown that he ever participated, or was given the opportunity to participate, in business meetings called by Germane to discuss its licensing procedures and policies. There certainly was no showing that Mr. Charlson participated in any day-to-day business meetings of Germane. Finally, aside from being Germane's largest creditor, Mr. Charlson had no economic interest in it. It is important to reemphasize at this point that a creditor interest is fundamentally different from a profit or equity interest.

Not only does the sham corporation theory fail because of defendant's failure to show that Mr. Charlson was a member of a noncorporate group which in reality conducted the business affairs of Germane, but it also fails for the more important reason that the trial record convincingly demonstrates that Germane was a viable entity that conducted business to advance its own interests. The trial record establishes that Germane did conduct substantial business activities in the sense of *Moline Properties, supra,* by holding and exploiting the patents through a scheme of centralized management independent of the shareholders' personal resources and careers. *See, e. g., Commissioner v. Laughton,* 133 F.2d 103 (9th Cir. 1940). Moreover, Germane's shareholders and directors conducted its business with Germane's self-interest in mind rather than with simply their own separate, individual self-interests in mind. As a result, Germane made substantial earnings and passed them along to its shareholders. Its 20 percent share of the royalties grew from about $12,725.10 in 1958, when it paid $8,100 in salaries and $2,463 in dividends, to a peak of $219,825.64 in 1969, when it paid $10,050 in salaries and $86,524.25 in dividends.

It should also be emphasized that the Germane shareholders gained no particular tax advantages by operating as a corporate business entity. At this point,

it is worthwhile to compare *Higgins v. Smith, supra,* which involved a sale by a sole shareholder to a corporation where the shareholder sought to treat the sale as a taxable transaction between two taxable entities for purposes of recognizing a loss deduction, with *Moline Properties v. Commissioner, supra,* where the taxpayer-shareholder wanted the corporate form disregarded in order to avoid double taxation on the sale of assets. In this instance, Germane was a personal holding company, and, as such, was subject to a personal holding company tax for any monies it retained. 26 U.S.C. § 541 *et seq.* (1970). To avoid this added tax, Germane distributed its income, within the meaning of the personal holding company tax provisions, to its shareholders who would report the dividend as ordinary income. The primary result is that Germane could not be used to accumulate royalty income, taxed at corporate rates, and to shield it from the higher tax rates for individuals. The absence of any definite tax advantage to operating as a corporation tends to reinforce the facts indicated that Germane was organized and operated for business purposes and that it was not a sham.

In sum, Germane was a viable corporation which owned its own assets, conducted its own licensing, earned its own money, and distributed it as it saw fit to advance its own needs and interests. The facts of this case dictate that Germane was not a sham corporation.

It must, therefore, be concluded that the sales agreement between Mr. Charlson and Germane did in fact transfer all of Charlson's substantial rights to his patents and applications in accordance with the terms of 26 U.S.C. § 1235 and plaintiffs are entitled to long-term capital gains treatment for payments received from Germane pursuant to said sales agreement. Accordingly, plaintiffs are entitled to recover $32,012.56 for 1961; $56,211.67 for 1962; and $66,274.81 for 1963, along with interest for each of the years as provided by law from the date of payment.

**Application of Christian J. JANSEN, Jr.**

**Patent Appeal No. 75–556.**

United States Court of Customs and Patent Appeals.

Nov. 20, 1975.

Rehearing Denied Jan. 15, 1976.

John Cameron McNett, Woodard, Weikart, Emhardt & Naughton, Indianapolis, Ind., attorney of record, for appellant.

Joseph F. Nakamura, Washington, D.C., for the Commissioner of Patents; Jack E. Armore, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MARKEY, Chief Judge.

This appeal is from a decision of the Patent and Trademark Office Board of