KLEINFELD, Senior Circuit Judge, concurring in part and dissenting in part: I respectfully dissent. My dissent is directed only to Section A, “Royalty Payments as Capital Gains.” I join in Section B, “Bad Debt Deduction.” As for Section C, “Accuracy Penalties,” whether and how the penalties would apply would need to be revisited if my view on royalties were to be accepted. The majority errs because it dilutes the meaning of “control” from the ability to compel a result to something less and indeterminate. This puts us at odds with our only sister circuit to rule on the matter, the Court of Claims in Charlson v. United States.[1] Both Charlson and the Commissioner’s own regulations show the error of the majority’s approach. The majority opinion accurately notes that in Charlson, the corporation to which inventor Lynn Charlson transferred his patent was owned by his “close friends and associates.” Actually, they were more than close friends and associates: three of the shareholders and directors were his employees, and the fourth was his personal attorney.[2] As such, Charlson could fire each of them if he disliked how they voted. The corporation also “frequently sought, received, and followed the recommendations of Charlson,”[3] and Charlson and the directors were “solicitous of each other’s individual interests as well as their mutual interests.”[4] The Commissioner argued that the corporation, the directors of which had their livelihoods subject to Charlson’s preferences, followed his recommendations, and were solicitous of his personal interests, was “controlled” by Charlson.[5] And Charlson certainly had more ability to influence than Cooper does. Cooper cannot fire his sister-in-law and her friend from their jobs. Yet Charlson won his case. The Commissioner lost.[6] Despite the evidence that the corporation did what Charlson wanted, the Court of Claims concluded that he did not “control” the corporation such that the transfer of patent rights was not genuine. Today’s majority opinion quotes Charl-son’s statement that the “retention of control by a holder of an unrelated corporation can defeat capital gains treatment, if the retention prevents the transfer of all substantial rights.”[7] That language marks the boundary of capital gains treatment, but Charlson held that the boundary was not crossed. Charlson had power over the corporate directors—far more power than Cooper had over TLC’s directors—but Charlson did not “control” the directors for the purposes of § 1235. The regulations make it clear that even though the directors in this case are Cooper’s friends and relatives, that does not amount to control or make TLC a “related” entity. The regulations are at pains to say that even transferring patent rights to a corporation controlled by one’s own brother “is not considered as transferring such rights to a related person.”[8] Since a brother is not a “related person” for § 1235(c) purposes, neither is a sister-in-law or a friend of a sister-in-law. The majority correctly concedes that “[mjere influence by the patent holder is insufficient to defeat § 1235(a) treatment.” But influence is all Cooper had. His authority over Walters (his sister-in-law) and Coulter (a friend of Walters and of Cooper’s wife) was considerably less than Charlson’s authority over his employees. Cooper’s situation is more like the one in Lee v. United States, where the transfer put the taxpayer’s own longtime personal friend in charge.[9] Yet in Lee, as in Charl-son, the Commissioner lost. Lee held that the issue of control is whether the taxpayer can “force” the transferee to do his bidding.[10] There is no evidence whatsoever that Cooper had that power. Walters and Coulter, like the directors in Charlson, were solicitous of Cooper’s and each other’s personal interests. They did transfer a few patents to Cooper for no consideration so that he could in turn transfer them to a corporation in which his children had an interest. But Walters and Coulter still owned 76% of the new corporation. (Instead of Cooper and his wife owning 24%, Cooper and his wife owned 1% and their children owned 23%.) And Cooper was not the only one who benefit-ted from TLC. Walters and Coulter each received $40,000 in director’s fees, and TLC bought them long-term insurance policies worth $115,406 and $63,089, respectively. Cooper did not receive an insurance policy. Although the Commissioner argues that the patent transfer benefitting Cooper’s children somehow breached a fiduciary duty to TLC’s shareholders, that argument would apply equally to the payments made to- Walters and Coulter. And it would be equally- irrelevant. All that a breach of fiduciary duty means is that Walters and Coulter, acting in their capacity as shareholders, could theoretically sue. themselves, in their capacity as directors. That unlikely possibility does not show control, The core of the Commissioner’s argument—that the directors knew nothing about Cooper’s sophisticated inventions and simply followed his instructions—does not show control. If anything, it shows that there was no good reason for them to reject Cooper’s recommendations, because it was his knowledge and skill that generated millions in revenue, so he did not need control. In distinguishing control from influence, our focus should not b.e merely on whether TLC’s directors did what Cooper wanted. There was no reason for them to do anything else. Instead we must ask whether, as a practical matter, they could have done otherwise. Cooper could have, but did not, set up the corporation to retain control. The most obvious way to control a corporation is. to own a majority of its stock. For exanaple, owning 100% of the . stock defeated the tax benefits in the classic sham case Gregory v. Helvering,[11] However, Congress provided that a patent holder cannot receive capital gains treatment if he owns 25% or more of the corporation to which he transferred his patents.[12] That is why Cooper and his wife owned only 24% of TLC’s stock. Minority shareholders may still control a corporation by controlling its directors’ votes, and there are well-established means by.which Cooper might have done so. Those means are often used in close corporations to protect minority shareholders from oppression. One way to retain control is to write the articles of incorporation to require a super-majority so that no decision can be made without the minority shareholders’ consent.[13] Another is to, establish' a voting trust' so that, the majority must vote their shares' in line with the minority’s preferences.[14] A third means is to use classified shares with the minority shares controlling the class that chooses the directors.[15] And a fourth is to contractually obligate the directors to vote consistently with the minority shareholders’ preferences.[16] This list is not exhaustive, of course. But Cooper did not do any of these things. If he had, then he would have, genuinely controlled TLC, not just influenced it. Because Cooper’s inventions generated TLC’s revenue, Walters and Coulter no doubt thought it was in TLC’s best interest to accommodate Cooper and keep him productive. But Cooper could, not always count on Walters and Coulter to do things his way. At some point, he would age out of his peak productivity, meaning there would be. less reason .to listen to him. Moreover, a change in. circumstances could always occur. As Professor Clark wrote in his treatise: As time passes, the personal relationships among the major participants in a close corporation always change in important ways. One of several participants will retire or die, leaving a gap in a shareholding or managerial role that might or might not be filled. Participants who were once friendly to each other will accumulate grudges. Some participants will want to go on to other ventures. Others will want to bring in new associates, who may or may not be acceptable to the others.[17] If, for example, a buyout offer could enrich Walters and Coulter but would end Cooper’s influence over TLC, that might create conflict between the shareholders. Yet Cooper would lack any power to make Walters and Coulter reject the buyout. They would be multimillionaires and he would lose his connection to his own inventions. Because the majority opinion makes “control” a vague and ambiguous term, it risks eviscerating § 1236 capital gains treatment when transfers are made to close corporations. Congress thought it was a good idea to give patent holders a tax benefit, but the majority’s decision creates so much risk of litigation that it may be a bad idea to claim the benefit. A transfer to a corporation directed by the inventor’s employees and attorney was good enough in Charlson,[18] A transfer to a corporation directed by one’s longtime friend was good enough in Lee.[19] And a transfer to a corporation controlled by one’s own brother is good enough under the regulations.[20] Yet now a transfer to a corporation controlled by one’s sister-in-law and her friend is not good enough, even if the taxpayer lacks any means to compel those directors to do his will. Accordingly, . it is not possible to say with confidence what close corporation arrangement will qualify for capital gains treatment, ; In short, the majority opinion does not say how “control” is distinct from “mere influence,” so mere influence of some vague and indeterminate kind prevents capital gains treatment. “Control” means the taxpayer can make the transferee corporation do what he wants, while “influence” means that although the corporation may defer to his judgment or be persuaded by his view, he cannot make the corporation do what he wants. The better approach is the one seen in Charlson and Lee\ that “control” means the ability to compel what the transferee corporation does. . 525 F.2d 1046 (Ct. Cl. 1975) (per curiam); cf. S. Corp. v. United States, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982) (en banc) (adopting Court of Claims opinions as binding precedent). . Charlson, 525 F.2d at 1048-49. . Id, at 1056. . Id. at 1055. . Id. at 1052. . Id. at 1057. . Id. at 1053 (internal quotation marks omitted). . 26 C.F.R. § 1.1235-2(f)(3); see 26 U.S.C. § 1235(c)(2). . 302 F.Supp. 945, 948 (E.D. Wis. 1969). . Id. at 950. . 293 U.S. 465, 467-69, 55 S.Ct. 266, 79 L.Ed. 596 (1935). . 26 U.S.C. § 1235(c)(1); see id. § 267(b)(2). . Robert C. Clark, Corporate Law 775 (1986). . Id. at 777. . Id. at 780. . Id. at 781-83. . Id. at 763. . 525 F.2d at 1048-49, 1057. . 302 F.Supp. at 948, 950. . 26 C.F.R. § 1.1235-2(0(3).