143 T.C. No. 10

UNITED STATES TAX COURT

JAMES C. COOPER AND LORELEI M. COOPER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17284-12.                    Filed September 23, 2014.

In 1997 P-H, an inventor, transferred several patents to T, a
corporation. Ps own 24% of the outstanding stock of T. P-W's sister
and Ps' friend own the remaining stock. P-H controlled T through its
officers, directors, and shareholders. Ps reported royalty income that
P-H received from T in exchange for the transfer of the patents as
capital gain under I.R.C. sec. 1235(a) for 2006, 2007, and 2008.

In 2006 P-H paid the engineering expenses of a related
corporation. Ps deducted these expenses as professional fees on a
Schedule C, Profit or Loss From Business, attached to their 2006
Federal income tax return.

Between 2005 and 2008 Ps advanced $2,046,901 to X, a
corporation, under the terms of a working capital promissory note.
P-H owned 24% of the outstanding stock of X during the years at
issue. X contracted with an Indian company to develop a new
product, and it used Ps' loans in part to fund the development of the

new product.  In 2008 the Indian company abandoned its development of the new product.  Ps claimed that X was insolvent and claimed a bad debt deduction under I.R.C. sec. 166 of $2,046,570 for 2008.

R determined that (1) the royalty payments P-H received from T did not qualify for capital gain treatment; (2) the engineering expenses were the ordinary and necessary expenses of a related corporation and Ps were not entitled to deduct those expenses; (3) Ps were not entitled to a bad debt deduction for 2008; and (4) Ps were liable for an accuracy-related penalty under I.R.C. sec. 6662(a) for each of the years at issue.

Held:  P-H did not transfer all substantial rights in the subject patents to T within the meaning of I.R.C. sec. 1235(a) because P-H controlled T during the years at issue.  See Charlson v. United States, 525 F.2d 1046, 1053 (Ct. Cl. 1975).  Ps are therefore not entitled to capital gain treatment under I.R.C. sec. 1235(a) for the royalties P-H received from T in exchange for the subject patents.

Held, further, Ps are entitled to deduct the engineering expenses for 2006.  Under Lohrke v. Commissioner, 48 T.C. 679, 688 (1967), P-H's primary motive in paying the expenses was to protect or promote his business as an inventor, and the expenditures constituted ordinary and necessary expenses in the furtherance or promotion of P-H's business.

Held, further, Ps are not entitled to a bad debt deduction under I.R.C. sec. 166 because Ps have failed to prove that the promissory note became worthless in 2008.

Held, further, Ps are liable for an accuracy-related penalty under I.R.C. sec. 6662(a) for each of the years at issue.

Lawrence T. Ullmann, for petitioners.

Nhi T. Luu and Christian A. Speck, for respondent.

MARVEL, Judge:  Respondent determined deficiencies in petitioners' Federal income tax of $580,961, $384,705, and $496,236 for 2006, 2007, and 2008, respectively, and accuracy-related penalties under section 6662(a)[1] of $116,192, $76,941, and $99,247 for 2006, 2007, and 2008, respectively.  After concessions,[2] the issues for decision are:  (1) whether royalties petitioner James Cooper received during 2006, 2007, and 2008 qualified for capital gain treatment pursuant to section 1235; (2) whether petitioners may deduct professional fees paid during 2006 that were attributable to expenses charged by Holmes Development for work performed with respect to U.S. Patent #5,157,489 (489

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Some monetary amounts have been rounded to the nearest dollar.

[2]The parties stipulated or conceded that petitioners are entitled to deduct on Schedule C, Profit or Loss From Business:  (1) travel expenses of $30,072, $18,432, and $21,444 for 2006, 2007, and 2008, respectively; and (2) professional fees of $82,585, $241,153, and $109,007 for 2006, 2007, and 2008, respectively.

patent);[3] (3) whether petitioners' advance of $2,046,570[4] to Pixel Instruments

Corp. (Pixel) is deductible as a nonbusiness bad debt for 2008 pursuant to section

166; and (4) whether petitioners are liable for section 6662(a) accuracy-related

penalties for the years at issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of

facts are incorporated herein by this reference. Petitioners resided in Nevada

when they petitioned this Court.

I. Patent Royalties

Mr. Cooper is an engineer and inventor. He has an undergraduate degree in

electrical engineering from Oklahoma State University and is the named inventor

on more than 75 patents in the United States.[5] His patents are primarily for

products and components used in the transmission of audio and video signals.

---

[3]The 489 patent was titled "Apparatus and Method for Reducing Quantizing Distortion".

[4]The parties stipulated that on December 31, 2008, the outstanding balance on the promissory note was $2,046,901. However, petitioners claimed a nonbusiness bad debt deduction for the outstanding balance on the promissory note of $2,046,570 for 2008.

[5]Mr. Cooper is also a patent agent entitled to represent third parties before the U.S. Patent and Trademark Office.

Petitioner Lorelei Cooper has an undergraduate degree in communications from Kent State University. She is not the named inventor on any patents.

In 1988 Mr. Cooper consulted Daniel Leckrone, an attorney specializing in patent law and patent licensing, regarding Mr. Cooper's portfolio of intellectual property. These consultations led to an agreement (commercialization agreement)[6] among Mr. Leckrone, Mr. Cooper, and Pixel wherein Mr. Cooper and Pixel assigned their portfolio of audio and video patents to VidPro,[7] a licensing company formed by Mr. Leckrone.

A number of disputes arose between Mr. Cooper and Mr. Leckrone under the commercialization agreement. In 1997 Mr. Cooper sent Mr. Leckrone notice that he was terminating the commercialization agreement. Mr. Cooper contended that under the terms of the commercialization agreement the patent rights held by VidPro automatically reverted to him as a result of the termination notice. Mr. Leckrone disagreed. Ultimately, this dispute led to litigation between Mr. Cooper

---

[6]The commercialization of a patent generally includes finding companies to manufacture products using the patent as well as finding and suing patent infringers for damages.

[7]At the time the commercialization agreement was signed VidPro was known as VideoTech.

and Mr. Leckrone, VidPro, and an attorney on VidPro's board of directors (Cooper-Leckrone litigation).[8]

Subsequently, petitioners, believing that all rights in VidPro's audio and video patents reverted to Mr. Cooper, incorporated Technology Licensing Corp., a California corporation (TLC),[9] with Lois Walters and Janet Coulter. Ms. Walters is petitioner Lorelei Cooper's sister and Ms. Coulter is a long-time friend of Ms. Cooper and Ms. Walters. Ms. Coulter and Ms. Walters resided in Ohio from 1997 through 2013, and both worked full time with companies other than TLC during

---

[8]The Cooper-Leckrone litigation ended in 2004 when a final arbitration award was entered determining, among other things, that the commercialization agreement was properly terminated as of January 21, 1997, and all rights, title, and interest that VidPro claimed in the patents were returned to Mr. Cooper or his assignee.

[9]Petitioners moved their principal residence from California to Nevada in November 2003. Petitioners, Ms. Walters, and Ms. Coulter then formed a second Technology Licensing Corp. with the Nevada secretary of state (TLC Nevada). Petitioners as cotrustees of the Cooper Trust U.D.T. December 11, 1991 (Cooper Trust), contributed $240 to TLC Nevada in exchange for 240 shares in TLC Nevada, and Ms. Walters and Ms. Coulter each contributed $380 to TLC Nevada in exchange for 380 shares in TLC Nevada (38%). Ms. Walters, Ms. Cooper, and Ms. Coulter were the president and chief financial officer, vice president, and secretary of TLC, respectively. On February 24, 2004, TLC merged into TLC-Nevada with TLC-Nevada as the surviving corporation. We refer to TLC Nevada as TLC unless otherwise indicated.

the years at issue.[10]  Neither Ms. Coulter nor Ms. Walters had any experience in patent licensing or patent commercialization before their involvement with TLC.

Petitioners incorporated TLC to engage in patent licensing and patent commercialization.  They wanted TLC to have the "aura" of a fully operating licensing corporation but also wanted people Mr. Cooper could trust--such as their close friend Ms. Coulter and their relative Ms. Walters--to be the shareholders, officers, and directors of TLC.[11]

Petitioners engaged Attorney R. Gordon Baker, Jr., to provide advice on forming TLC.  Among other things, Mr. Baker advised petitioners on the requirements of section 1235 and qualifying the royalty payments Mr. Cooper would receive from TLC as capital gain under that section.  Mr. Baker advised petitioners that (1) they could not control TLC directly or indirectly and (2) their stock ownership in TLC had to be less than 25% of the total outstanding stock.

---

[10]Ms. Walters has a B.A. degree in finance from Cleveland State University. During the years at issue she was an employee of the National Multiple Sclerosis Society in Independence, Ohio.  Ms. Coulter has a B.S. degree in animal science from Ohio State University and an M.S. in agricultural economics from the University of Wyoming.  She owns her own construction company, Multi-Maintenance, Inc., in Ohio and was an employee of Multi-Maintenance during the years at issue.

[11]TLC did not have an office or other formal business location.

Consistent with Mr. Baker's advice, the outstanding stock of TLC at formation was as follows: petitioners as cotrustees of the Cooper Trust owned 240 shares (24%); (2) Lois Walters owned 380 shares (38%); and (3) Janet Coulter owned 380 shares (38%). Ms. Walters and Ms. Coulter each made an initial contribution of $3,800 to TLC in exchange for their shares while petitioners as cotrustees of the Cooper Trust contributed $2,400 for the trust's shares. Ms. Walters, Ms. Cooper, and Ms. Coulter were the president and chief financial officer, vice president, and secretary of TLC, respectively.[12] Mr. Cooper was the general manager of TLC.

On March 15, 1997, Mr. Cooper and Pixel entered into agreements (collectively, TLC agreements) with TLC purportedly transferring all of Mr. Cooper's and Pixel's rights in the patents (subject patents) giving rise to the royalties at issue in this case to TLC. Under each TLC agreement, the licensor (i.e., Mr. Cooper or Pixel) receives 40% of all gross proceeds received by TLC for any sublicense and 40% of all damages received in litigation or settlement of

---

[12]Beginning in 2004 or 2005 and continuing through the years at issue, Ms. Coulter performed most of Ms. Walters' duties at TLC. At that time, Ms. Walters was working more than 50 hours per week for the National Multiple Sclerosis Society and spending substantial time caring for her ill father.

litigation. The licensor then receives 90% of all remaining net proceeds as defined in the TLC agreements.

By 1999 TLC had begun experiencing financial difficulty. It could not effectively license its patents because the patents were the subject of the Cooper-Leckrone litigation and potential licensees were wary of TLC's authority to license the patents. Furthermore, TLC needed legal representation to pursue patent infringement cases.

In an effort to solve TLC's financial difficulties, Mr. Cooper contacted Anthony Brown, who was in the business of helping inventors protect and enforce their patents. Mr. Brown owned IP Innovation, LLC (IP Innovation). Subsequently, TLC, Mr. Cooper, and Pixel entered into an agreement (IP Innovation assignment agreement) with IP Innovation assigning an undivided interest in Patent #5,424,780 (780 patent) to IP Innovation.[13] Then, IP Innovation, Mr. Cooper, Pixel, and TLC engaged the patent law firm of Niro, Scavone, Haller & Niro (Niro firm) to represent their interests with respect to the 780 patent. Mr.

---

[13]On August 12, 2002, TLC, Pixel, Mr. Cooper, and IP Innovation executed an agreement (exclusive license agreement) expanding IP Innovation's license beyond the 780 patent by providing an exclusive, perpetual, and irrevocable license to several additional patents. TLC, Pixel, Mr. Cooper, and IP Innovation amended the exclusive license agreement on October 31, 2002, and on November 12, 2004, the exclusive license agreement was terminated.

Cooper agreed to provide technical assistance to the Niro firm as necessary to assist the firm in interpreting the patents, technology, and devices that would be the subject of the licensing and infringement matters the firm was pursuing. Mr. Cooper was not compensated for providing technical assistance to the Niro firm.

On February 28, 2003, TLC and its shareholders adopted a stock restriction agreement providing in relevant part that TLC's shares could not be sold, assigned, or transferred except according to the terms of the stock restriction agreement. Under the agreement petitioners were permitted to transfer shares of TLC stock to their issue or any trust for the benefit of their issue. No other TLC shareholder (i.e., Ms. Coulter or Ms. Walters) was permitted to transfer shares of TLC stock to her issue or any party other than a shareholder. Mr. Baker drafted the stock restriction agreement in his role as petitioners' estate planning attorney. Despite owning a majority of TLC's outstanding stock and being on the board of directors, neither Ms. Coulter nor Ms. Walters negotiated the terms of the stock restriction agreement.[14]

---

[14]Neither Ms. Coulter nor Ms. Walters consulted an attorney before signing the stock restriction agreement, and neither could recall the circumstances of her signing the agreement. They did not receive any consideration for giving up their right to transfer their shares in TLC. Mr. Baker testified that the restrictions on Ms. Walters' and Ms. Coulter's ability to transfer shares in TLC were inadvertent and done in error. We find Mr. Baker's testimony unconvincing in the light of our

(continued...)

In 2004 Anthony Brown formed New Medium, LLC (New Medium), and AV Technologies, LLC (AV Technologies), to pursue patent commercialization. TLC, Pixel, and Mr. Cooper subsequently entered into licensing agreements for certain patents with both New Medium and AV Technologies (collectively, New Medium and AV Technologies agreements). In or about 2004 Acacia Technologies Group (Acacia) purchased IP Innovation and IP Innovation became a subsidiary of Acacia. On March 23, 2005, the parties to the New Medium and AV Technologies agreements and the IP Innovation assignment agreement clarified by agreement (letter agreement) that all material decisions (i.e., licensing, litigation, and prosecution) with respect to the New Medium and AV Technologies agreements and the IP Innovation assignment agreement were to be made according to a majority vote of Mr. Cooper, Acacia,[15] and Anthony Brown. Under the letter agreement TLC did not have a vote with respect to the material decisions

---

[14](...continued)
finding that Mr. Cooper indirectly controlled TLC. See infra p. 31. Mr. Cooper had ample motivation to ensure that the stock of TLC was not transferred to parties he could not control.

[15]Under the letter agreement Acacia was defined as IP Innovation, New Medium, and AV Technologies.

under either the IP Innovation assignment agreement or the New Medium and AV Technologies agreements.[16]

Among the patents transferred by Mr. Cooper to TLC under the terms of the TLC agreements were three patents known as the "Lowe patents". The Lowe patents included the 489 patent. On January 18, 2006, TLC transferred the Lowe patents back to Mr. Cooper. He did not pay any money or transfer any other consideration to TLC for the return of the Lowe patents. The agreement transferring the Lowe patents from TLC to Mr. Cooper simply states that the

---

[16]The letter agreement provides that "all material decisions with respect to the * * * [IP Innovation assignment agreement and the New Medium and AV Technologies agreements] will be made by a majority of Cooper, the Acacia Companies, and Anthony Brown, including without limitation, all licensing, litigation, and prosecution decisions." Petitioners contend that the above-referenced provision in the letter agreement mistakenly uses the term Cooper instead of "Cooper Parties". "Cooper Parties" was defined in the letter agreement to include TLC, while "Cooper" was defined as J. Carl Cooper (petitioner James C. Cooper).

Generally, where the terms of a contract are unambiguous, we presume that the contracting parties intended what they stated and will interpret the contract as written. See, e.g., Peco Foods, Inc. v. Commissioner, T.C. Memo. 2012-18, aff'd, 522 Fed. Appx. 840 (11th Cir. 2013); see also Canfora v. Coast Hotels & Casinos, Inc., 121 P.3d 599, 603 (Nev. 2005) (holding that when a contract is clear on its face it will be enforced as written). As a result, we presume the parties intended what they stated in the letter agreement and infer that Mr. Cooper (and not TLC) was entitled to vote on material decisions regarding the IP Innovation assignment agreement and the New Medium and AV Technologies agreements.

parties completed the transfer because TLC had not licensed the Lowe patents and TLC and Mr. Cooper desired to return the Lowe patents to Mr. Cooper.

On January 23, 2006, Mr. Cooper transferred the Lowe patents to Watonga Technology, Inc. (Watonga). The shareholders of Watonga were as follows: the Cooper Trust (1%); petitioners' son (11.5%); petitioners' daughter (11.5%); Ms. Coulter and Ms. Walters (76% combined). Ms. Coulter was the president of Watonga.[17] Under the agreement transferring the Lowe patents to Watonga, Mr. Cooper received 55% of all net revenue (as defined in the agreement), and Watonga retained 20% of all net revenue.[18] Watonga received $120,000 in gross receipts from the license of the 489 patent in 2007.[19]

---

[17]Although she was Watonga's president, Ms. Coulter testified that she did not know whether Watonga licensed any patents during 2006.

[18]The remaining 25% of net revenue was payable to Virgil Lowe or his nominee. Mr. Lowe was the original owner of the Lowe patents. He sold the Lowe patents to Mr. Cooper in 1995 for $40,000 and 25% of all net revenue received from any third party in connection with the license of the patents.

[19]Watonga purportedly paid TLC $72,000 in 2007 with respect to the 489 patent. It is unclear from the record whether such a payment was made and, if so, pursuant to what agreement the payment was made. Mr. Cooper testified at trial that he could not recall the details of the payment and was not sure whether Watonga had a licensing agreement with TLC. He further testified that the document notating the payment could be in error or that the payment could be the result of a prior agreement that was not in the record. In the light of Mr. Cooper's testimony and our review of the record, we do not find credible the contention that

(continued...)

The amount of the royalties paid each year to Mr. Cooper was determined under the TLC agreements by accountants hired by TLC. Neither Ms. Walters nor Ms. Coulter, who were the majority shareholders as well as officers and directors, reviewed and verified the amount of royalties paid to Mr. Cooper each year.[20] Similarly, neither Ms. Walters nor Ms. Coulter negotiated the terms of TLC's agreements to licence the subject patents to other companies. Instead, Ms. Walters and Ms. Coulter relied on TLC's attorneys and the technical expertise of Mr. Cooper with regard to TLC's licensing activities. During the years at issue, Ms. Walters and Ms. Coulter's duties as directors and officers consisted largely of signing checks and transferring funds as directed by TLC's accountants and signing agreements as directed by TLC's attorneys. The only compensation Ms. Walters and Ms. Coulter received from TLC was director's fees paid during some years and long-term care insurance policies purchased by TLC in 2003. TLC had no employees and paid no compensation to any party.

---

[19](...continued)
Watonga paid TLC anything of value with respect to the 489 patent in 2007.

[20]Ms. Coulter testified that her review of the royalties paid annually to Mr. Cooper consisted solely of reviewing the statement provided by the accountants regarding the amount of royalties to be paid and agreeing with it.

We infer from the record and find that substantially all of TLC's decisions regarding licensing, patent infringement, and patent transfers were made either by Mr. Cooper or at his direction. We further find that Mr. Cooper controlled TLC in all material respects. Ms. Coulter and Ms. Walters acted in their capacities as directors and officers of TLC at the direction of Mr. Cooper. They did not make independent decisions in accordance with their fiduciary duties to TLC or act in their best interests as shareholders.

II. Professional Fees

During late 2005 and 2006 Mr. Cooper engaged Mike Holmes of Holmes Development to complete reverse engineering and related services with respect to the 489 patent (reverse engineering services). The reverse engineering services included disassembling televisions and DVD recorders to determine how the products were designed and manufactured and whether any of the products were infringing on Mr. Cooper's patents.

The invoices for the reverse engineering services were addressed to Mr. Cooper individually and not to TLC or Watonga.[21] Yet TLC and Watonga were the principal owners of the 489 patent during the period when Mr. Holmes

---

[21]Mr. Cooper transferred the 489 patent to TLC in 1997. TLC returned the 489 patent to Mr. Cooper on January 18, 2006, and Mr. Cooper transferred the 489 patent to Watonga on January 23, 2006. See supra pp. 12-13.

completed the reverse engineering services. Mr. Cooper owned the 489 patent for only a few days in 2006. He paid Holmes Development $108,519 in 2006 for the reverse engineering services.

III.    Pixel Instruments/Bad Debt

Petitioners incorporated Pixel in 1983 for the purpose of designing and manufacturing audio and video signal processing products. Specifically, Pixel designed products to measure and correct errors in the synchronization of sound and video images. Mr. Cooper was the president of Pixel at all relevant times. Ms. Cooper held various positions with Pixel from 1983 to 2004, including the position of vice president.

In September 1995 Pixel executed a working capital promissory note (promissory note) wherein it promised to pay to the Cooper Trust all sums advanced to Pixel by the Cooper Trust up to $1.5 million. On May 14, 2004, Pixel and the Cooper Trust amended the promissory note to increase the maximum loan amount to $2.5 million.

Until some point in 2006 petitioners wholly owned Pixel. In 2006 petitioners transferred 76% of their shares in Pixel to Mirko Vojnovic and Christopher Smith. Mr. Smith was a longtime consultant to Pixel. He and Mr. Vojnovic owned 22% and 54% of Pixel's shares, respectively, during the years at

issue.[22]  They paid nothing or a de minimis amount for their shares.  However, in conjunction with the Cooper Trust's transfer of shares to Mr. Smith and Mr. Vojnovic, Pixel transferred certain intellectual properties--including its rights to royalties from the patents Pixel previously licensed to TLC--to Mr. Cooper.

When televisions changed from standard definition to high definition in the mid-to-late-2000s, many of Pixel's products became obsolete.  In an effort to better compete in the marketplace, Pixel began developing a product known as Liptracker to correct lip synchronization errors in high definition televisions.  Between 2005 and 2008 petitioners as cotrustees of the Cooper Trust advanced funds to Pixel under the terms of the promissory note.  These funds were used in part to fund the Liptracker program.

Pixel contracted with an Indian company to complete the software development necessary for Liptracker.  Pixel's goal was to have a working and salable Liptracker product for presentation at the National Association of Broadcasters convention in April 2008.  Unfortunately, the Indian company could not fulfill its promise to develop the Liptracker software, and Pixel was unable to proceed with the development on its own.  Pixel met with representatives from the

---

[22]Mr. Vojnovic sold all of his Pixel shares to Mr. Smith in April 2011 for $1.

Indian company in July 2008 who confirmed the company was abandoning its development of the Liptracker software.

In 2008 Pixel faced financial difficulty. It had no new products in development--aside from the stalled Liptracker product--and few older products that were still marketable. Its gross receipts were in excess of $525,000 in both 2005 and 2006 but decreased significantly in 2007 and 2008.

However, Pixel continued business operations through at least 2012. It was the assignee of many patents in 2008 and thereafter and had an active licensing agreement with TLC.[23] Pixel's gross receipts were $92,603, $148,968, $26,912, $22,500, and $22,500[24] for 2008, 2009, 2010, 2011, and 2012, respectively. Pixel had total yearend assets each year from 2008 through 2012 in excess of $172,000, including more than $319,000 in both 2011 and 2012.

Mr. Cooper continued to advance funds to Pixel under the terms of the promissory note throughout 2008. On December 31, 2008, the outstanding

---

[23]Pixel was the assignee or assignor on a number of filings with the U.S. Patent and Trademark Office from 2010 through 2012. Mr. Cooper testified that these assignments were confirming assignments that had occurred many years before and did not transfer anything new of value to Pixel. According to Mr. Cooper, these confirmatory assignments were necessary to show proper chain of title.

[24]The gross receipts of $22,500 in 2011 and 2012 consisted of a single annual trademark royalty that will continue for the foreseeable future.

balance on the promissory note was $2,046,901. Mr. Cooper concluded at that time that Pixel could not pay the outstanding balance on the Pixel note, and petitioners treated the balance as a nonbusiness bad debt on petitioners' 2008 Federal income tax return. Petitioners did not initiate any type of litigation[25] to recover the amounts they lent Pixel under the terms of the promissory note and it is unclear from the record what demands, if any, they made for payment of the outstanding balance.

## IV. Petitioners' Tax Reporting and Notice of Deficiency

Petitioners jointly filed Forms 1040, U.S. Individual Income Tax Return, for each of the years at issue. They reported the royalty payments Mr. Cooper received from TLC as capital gain on Schedules D, Capital Gains and Losses, attached to their Forms 1040. The amounts of royalty payments petitioners reported for 2006, 2007, and 2008 were $3,248,886, $1,933,010, and $1,597,450, respectively. Petitioners also reported income and expenses from Mr. Cooper's patent licensing business on Schedules C attached to their Form 1040 for each of the years at issue. Among the deductions claimed for 2006 was $108,519 for

---

[25]Mr. Cooper testified that he consulted attorney Mitch Mitchell, who had previously represented Mr. Cooper in the Cooper-Leckrone litigation, regarding pursuing litigation against Pixel for the balance due on the promissory note. Mr. Cooper claimed that he subsequently determined that litigation against Pixel would be futile.

professional fees paid to Holmes Development during 2006. Finally, for 2008, petitioners claimed a bad debt deduction of $2,046,570 on a Schedule D attached to their Form 1040. This deduction was for the purportedly uncollectible loan to Pixel under the terms of the promissory note.

On April 4, 2012, respondent issued the notice of deficiency to petitioners. Respondent determined that (1) the royalties Mr. Cooper received from TLC did not qualify for capital gain treatment under section 1235 because Mr. Cooper controlled TLC; (2) petitioners could not deduct certain expenses for the years at issue; and (3) petitioners were not entitled to a bad debt deduction under section 166 for the promissory note because petitioners had not shown that the promissory note became worthless in 2008.

## OPINION

### I. Burden of Proof

Ordinarily, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The burden of proof shifts to the Commissioner, however, if the taxpayer produces credible evidence to support the deduction or position, the taxpayer complied with any substantiation requirements, and the taxpayer

cooperated with the Secretary[26] with regard to all reasonable requests for information. Sec. 7491(a); see also Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

Petitioners do not assert nor have they proven that they are entitled to a shift in the burden of proof under section 7491(a)(1). Accordingly, petitioners bear the burden of proof with respect to respondent's deficiency determinations.

II.    Section 1235 Gain

A.    Whether a Holder's Control Over an Unrelated Corporate Transferee Defeats Capital Gain Treatment Under Section 1235

Section 1235(a) provides that a transfer (other than by gift, inheritance, or devise) of all substantial rights to a patent by any holder[27] shall be treated as the sale or exchange of a capital asset held for more than 1 year, regardless of whether the payments in consideration of such transfer are contingent on the productivity, use, or disposition of the property transferred. Thus, in order for the transfer of a patent to qualify as a sale or exchange, the owner must transfer "all substantial

---

[26]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

[27]The term "holder" includes any individual whose efforts created such property. Sec. 1235(b)(1).

rights"[28] to the property. See sec. 1235(a); see also Juda v. Commissioner, 90 T.C. 1263, 1281 (1988), aff'd, 877 F.2d 1075 (1st Cir. 1989). For purposes of section 1235, the term "all substantial rights"[29] means "all rights * * * which are of value at the time the rights * * * are transferred." Sec. 1.1235-2(b)(1), Income Tax Regs.[30] The retention of the right to terminate the transfer at will is the retention of a substantial right under section 1235.[31] Sec. 1.1235-2(b)(4), Income Tax Regs.

---

[28]Generally, an assignment is a transfer of all substantial rights to a patent, see Juda v. Commissioner, 877 F.2d 1075, 1078 (1st Cir. 1989), aff'g 90 T.C. 1263 (1988), while a license is a transfer of less than all substantial rights in a patent, see Kueneman v. Commissioner, 68 T.C. 609, 613 (1977), aff'd, 628 F.2d 1196 (9th Cir. 1980).

[29]We have previously stated that transactions between shareholders and their closely held corporations should be closely scrutinized in determining whether there has been a transfer of all substantial rights in a patent. See McDermott v. Commissioner, 41 T.C. 50, 59 (1963).

[30]Sec. 1.1235-1(b), Income Tax Regs., provides that if a transfer is not one described in sec. 1.1235-1(a), Income Tax Regs. (transfer of all substantial rights to a patent by a holder to a person other than a related person), then sec. 1235 does not apply to determine whether such transfer is the sale or exchange of a capital asset. In other words, a transfer by a person other than a holder or a transfer by a holder to a related person is not governed by sec. 1235. Sec. 1.1235-1(b), Income Tax Regs. Instead, the tax consequences of such transactions are determined under other provisions of the Code. Id. Petitioners do not contend that Mr. Cooper is entitled to capital gain treatment under any provisions of the Code (e.g., sec. 1221 or sec. 1231) other than sec. 1235.

[31]In determining whether a transfer of all substantial rights to a patent has occurred, the language of the transfer agreement is not controlling. Sec. 1.1235-2(b)(1), Income Tax Regs. Instead, the entire agreement and the form of the

(continued...)

Finally, under section 1235(d), transfers between related persons, as defined in section 267(b), are not eligible for capital gain treatment, and for purposes of section 1235, a corporation and an individual owning 25% or more of the stock of such corporation directly or indirectly are related persons. Sec. 267(b)(2), (c).

Respondent does not dispute that (1) the transfer of the patents to TLC under the TLC agreements was other than by gift, inheritance, or devise; (2) Mr. Cooper qualified as a holder of the subject patents; and (3) petitioners owned less than 25% of TLC for purposes of section 1235(d). However, respondent contends that Mr. Cooper effectively retained a right to terminate the transfers under the TLC agreements, see sec. 1.1235-2(b)(4), Income Tax Regs., because he indirectly controlled TLC through its directors, officers, and shareholders. Therefore, respondent contends that Mr. Cooper did not transfer all substantial rights in the subject patents and is not entitled to capital gain treatment. Petitioners contend that Mr. Cooper did not control TLC and that the directors, officers, and shareholders of TLC acted independently of Mr. Cooper in their corporate decisionmaking.

---

[31](...continued)
transaction must be examined to see if all substantial rights were transferred. See Juda v. Commissioner, 877 F.2d at 1078.

Neither the Code nor applicable regulations specifically address whether section 1235 applies to transfers to a corporation that is not related to the holder but is indirectly controlled by the holder. Whether a holder's control over a corporate transferee that is unrelated (within the meaning of section 1235(d)) defeats capital gain treatment appears to be an issue of first impression for this Court. However, the Court of Claims[32] in <u>Charlson v. United States</u>, 525 F.2d 1046, 1053 (Ct. Cl. 1975),[33] considered this issue and concluded that such control could prohibit the transfer of substantially all rights in a patent and therefore preclude capital gain treatment under section 1235.

The Court of Claims in <u>Charlson</u> examined the legislative history of section 1235 and stated that "it is * * * clear that retention of control by a holder over an unrelated corporation can defeat capital gains treatment, if the retention prevents

[32]The Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25, merged the United States Court of Claims into the newly created Court of Appeals for the Federal Circuit and, in effect, reconstituted the trial division of the Court of Claims into a newly created United States Claims Court, a so-called Article I court. Subsequently, the United States Claims Court was renamed the United States Court of Federal Claims. Federal Courts Administration Act of 1992, Pub. L. No. 102-572, sec. 902(a)(1), 106 Stat. at 4516.

[33]In <u>Charlson v. United States</u>, 525 F.2d 1046 (Ct. Cl. 1975), the Court of Claims found that on the facts of that case the taxpayer did not control the transferee corporation, and thus the taxpayer was not precluded from claiming capital gain treatment under sec. 1235. <u>See</u> <u>infra</u> pp. 27-29.

the transfer of 'all substantial rights.'" Id. The court supported its conclusion by reasoning that the holder's control over the unrelated corporation "places him in essentially the same position as if all substantial rights had not been transferred." Id. The court found further support for its reasoning in the legislative history of section 1235, noting that a court should closely examine all of the facts and circumstances of transactions under section 1235 and not rely solely on the terms of the transfer agreement to determine whether the owner transferred substantially all rights in the patent to the transferee. See id. (citing S. Rept. No. 83-1622, at 439-440 (1954), 1954 U.S.C.C.A.N. 4621, 5083).

We agree that retention of control places the holder in essentially the same position as if the patent had not been transferred, thereby precluding the application of section 1235. See id. We further agree that Congress intended for a "transferor's acts to speak louder than his words in establishing whether a sale of a patent has occurred". Id. Accordingly, we hold that retention of control by a holder over an unrelated corporation can defeat capital gain treatment under section 1235 because the retention prevents the transfer of "all substantial rights" in the patent.

B.     Whether Mr. Cooper Retained Control Over TLC and Therefore Did Not Transfer All Substantial Rights in the Subject Patents to TLC

Petitioners rely on the facts regarding control in Lee v. United States, 302 F. Supp. 945 (E.D. Wis. 1969), and Charlson to support their contention that the directors, officers, and shareholders of TLC acted independently of Mr. Cooper in their corporate decisionmaking and that they are entitled to capital gain treatment under section 1235. We disagree because the facts regarding control in Lee and Charlson are distinguishable from the facts regarding control in this case. Here, the facts support our finding that Mr. Cooper indirectly controlled TLC. We explain below.

In Lee, the taxpayer transferred patents to Lee Custom Engineering, Inc. (Lee Engineering), a closely held corporation. The three shareholders of Lee Engineering were unrelated but were all friends. The taxpayer owned 24% of the outstanding stock of Lee Engineering. The Government argued that the taxpayer had not transferred all substantial rights in his patents because he controlled Lee Engineering--the exclusive licensee of the patents. Therefore, the Government argued that the taxpayer did not effectively transfer his patents under section 1235.[34] The District Court rejected the Government's contentions, stating among

---

[34]The court in Lee interpreted the Government's argument to be that no

(continued...)

other things, that there was "no evidence presented which suggested * * * [the taxpayer] was * * * able to force the other stockholders or directors to do his bidding." Lee, 302 F. Supp. at 950.

In Charlson, the taxpayer transferred an exclusive license to Germane Corp. (Germane) to use, manufacture, and sell items incorporating his patents in exchange for 80% of the royalties that Germane received from licensing the patents to others. Germane was formed for the specific purpose of purchasing and licensing the taxpayer's patents, and the shareholders and directors of Germane were all trusted business associates, friends, and employees of the taxpayer.

The taxpayer treated the royalties he received from Germane as capital gain under section 1235. The Government argued that the taxpayer had not transferred all substantial rights in the patents to Germane because he controlled Germane. In effect, the Government argued that the taxpayer had a tacit understanding with

---

[34](...continued)
transfer had occurred under sec. 1235 because the purported transfer was between parties within the same economic group. Lee v. United States, 302 F. Supp. 945, 950 (E.D. Wis. 1969). The court rejected the Government's argument because it reasoned that under sec. 1235(d) Congress considered transfers within the same economic group to be "transfers to a corporation in which 25% or more of the outstanding stock was owned by the transferor. Congress did not at any point in the legislative history of this section indicate an intent to prohibit as a matter of course transfers to a closed corporation." Id.

Germane that he would have final veto over any license agreement that Germane made with respect to his patents.

The court found that although the relationships among the taxpayer, Germane, and the shareholders made more probable the existence of prohibited retained control, the evidence did not establish that the taxpayer was able to exercise such control over Germane. Charlson 525 F.2d at 1055. Instead, the court found that Germane exercised its rights in the patents according to its own discretion even though it frequently sought, received, and followed the taxpayer's advice. Id. at 1056.

The court noted, among other things, that the shareholders in Germane all had skills valuable to a small patent licensing company. Id. at 1049. These skills included legal, engineering, design, and business expertise. Id. Further, the court found that although the taxpayer was present in many of Germane's licensing negotiations, this was mutually beneficial to both parties since it would potentially lead to higher royalties. Moreover, there was no evidence that the taxpayer--and not Germane--decided the terms of the licensing agreements. Finally, although the taxpayer participated as a joint plaintiff with Germane in patent infringement actions, there was no evidence that the taxpayer controlled or directed the details of the litigation. Id. at 1055. In short, the court rejected the Government's

position that the taxpayer controlled the operation of Germane. As a result, the court held that the taxpayer had transferred all substantial rights in his patents to Germane--entitling him to capital gain treatment under section 1235. Id. at 1057.

By contrast, TLC did not exercise its rights in the subject patents according to its own discretion. Both Lee and Charlson are distinguishable because the taxpayers in those cases did not control the transferee corporations. Here, Mr. Cooper--troubled by his deteriorated business relationship with Mr. Leckrone--formed TLC with individuals he could trust and ultimately control. Ms. Coulter and Ms. Walters--the shareholders and directors of TLC (along with Ms. Cooper) --did not have the patent, engineering, or other such skills to make them particularly valuable to a small patent licensing company. Instead, they were individuals whom Mr. Cooper could trust to follow his direction on patent licensing issues. Indeed, Ms. Coulter testified that the technical negotiations regarding licensing and patent infringement were over her head and she deferred to Mr. Cooper on such issues. She further testified that she signed licensing and infringement agreements when directed to do so by TLC's attorneys and signed checks and transferred funds when directed to do so by TLC's accountants.

As officers and directors of TLC, Ms. Coulter and Ms. Walters took numerous actions that are inconsistent with acting independently and in the best

interest of the corporation. Among other things, Ms. Coulter and Ms. Walters approved TLC's transfer of potentially valuable patents to Mr. Cooper for no consideration. At least in one instance, Mr. Cooper almost immediately licensed one of these patents to another related corporation for which that corporation received a royalty of $120,000 in 2007. As shareholders Ms. Coulter and Ms. Walters signed a stock restriction agreement placing restrictions on their ability to transfer shares of stock in TLC to anyone other than petitioners, without receiving any consideration in exchange. The stock restriction agreement did not place similar restrictions on petitioners.

Indeed, it is unclear what material decisions, if any, the officers and directors of TLC made independent of Mr. Cooper.[35] Mr. Cooper--and not the officers or directors of TLC--provided technical assistance to the Niro firm in interpreting the subject patents and relevant technology and in formulating patent enforcement strategies. Mr. Cooper conducted all technical matters for TLC-- which in substance was all or a large part of TLC's activities. Furthermore, in his role as general manager of TLC and under the terms of the letter agreement, Mr.

---

[35]Ms. Coulter testified that she often followed the advice of TLC's attorneys, but she did not know who at TLC was directing TLC's attorneys. We infer from the record and find that TLC's attorneys drafted licensing agreements and patent infringement agreements largely at the direction of Mr. Cooper.

Cooper made all material decisions for TLC with respect to the IP Innovation assignment agreement and the New Medium and AV Technologies agreements.

We do not find credible any testimony by petitioners that TLC was an independent corporation that Mr. Cooper did not control. We conclude that petitioners have failed to meet their burden of establishing that they transferred all substantial rights in the subject patents to TLC pursuant to section 1235(a). See Rule 142(a). Accordingly, we sustain respondent's determination that petitioners' royalty income for 2006, 2007, and 2008 did not qualify for capital gain treatment under section 1235(a).

## III.   Professional Fees

Generally, a taxpayer is entitled to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business. See sec. 162(a); Am. Stores Co. v. Commissioner, 114 T.C. 458, 468 (2000).[36] An expense is ordinary if it is customary or usual within the particular trade, business, or industry or if it relates to a transaction "of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940). An expense is necessary

---

[36]Additionally, sec. 212 generally allows a taxpayer to deduct the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income. Such expenses must be reasonable in amount and bear a proximate relationship to the production or collection of taxable income. Sec. 1.212-1(d), Income Tax Regs.

if it is appropriate and helpful for the development of the business. See Commissioner v. Heininger, 320 U.S. 467, 471 (1943). To be deductible, ordinary and necessary expenses must be "directly connected with or pertaining to the taxpayer's trade or business". Sec. 1.162-1(a), Income Tax Regs. Deductions are a matter of legislative grace, and a taxpayer must prove that he is entitled to the deductions he claims. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Generally, a taxpayer who pays another taxpayer's business expenses may not treat those payments as ordinary and necessary expenses incurred in the payor's trade or business. See Deputy v. du Pont, 308 U.S. at 494-495; Columbian Rope Co. v. Commissioner, 42 T.C. 800, 815 (1964). An exception exists for cases in which the taxpayer paid another taxpayer's ordinary and necessary business expenses in order to "protect or promote" the taxpayer's own business. See, e.g., Scruggs-Vandervoort-Barney, Inc. v. Commissioner, 7 T.C. 779, 787 (1946). In Lohrke v. Commissioner, 48 T.C. 679, 688 (1967), we articulated a two-part test for determining whether a taxpayer's payments are eligible for this exception: (1) The taxpayer's primary motive for paying the expenses was to protect or promote the taxpayer's business and (2) the expenditures constituted ordinary and necessary expenses in the furtherance or promotion of the taxpayer's business.

Under the <u>Lohrke</u> test, we must first "ascertain the purpose or motive which cause[d] the taxpayer to pay the obligations of the other person." <u>Id.</u> To meet this prong, Mr. Cooper's purpose in paying the Holmes Development expenses must have been for the benefit of his business as an inventor. We "must then judge whether it is an ordinary and necessary expense of the * * * [taxpayer's] trade or business; that is, is it an appropriate expenditure for the furtherance or promotion of that trade or business? If so, the expense is deductible by the individual paying it." <u>Id.</u>

Petitioners claimed a deduction of $108,519 in 2006 for professional fees paid to Mr. Holmes for reverse engineering services. Respondent disallowed this deduction in its entirety. Respondent contends that these expenses are properly chargeable to Watonga or TLC and are not Mr. Cooper's ordinary and necessary business expenses. Petitioners contend that these expenses are the ordinary and necessary expenses of Mr. Cooper's business as an inventor. Alternatively, petitioners contend that even if we find that the expenses are properly chargeable to Watonga or TLC, petitioners are still entitled to deduct the expenses.

Mr. Holmes' reverse engineering services included the disassembling of televisions and DVD recorders to determine how the products were designed and manufactured and whether any of the products infringed on Mr. Cooper's patents.

The invoices for the reverse engineering expenses indicated that the services were completed with respect to the 489 patent. However, Mr. Cooper testified that most of these expenses were unrelated to the 489 patent. For example, according to Mr. Cooper, the reverse engineering services included the reverse engineering of plasma televisions that use random dithering and not coherent dithering--the subject of the 489 patent. Regardless, petitioners stipulated that the reverse engineering expenses were for services performed with respect to the 489 patent.[37] Petitioners are bound by their stipulation. See, e.g., Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320, 330 (1997), aff'd without published opinion, 208 F.3d 205 (3d Cir. 2000); see also Rule 91(e). Because TLC and Watonga, as applicable, owned the 489 patent during the period in which Mr. Holmes completed his services, see supra pp. 12-13, we conclude that the reverse engineering expenses were the ordinary and necessary business expenses of TLC and Watonga. Nevertheless, because petitioners paid the reverse engineering

---

[37]The parties filed a stipulation of settled issues on June 10, 2013, stating that "[t]he legal and professional services expenses not allowed by respondent for taxable year 2006 in the amount of $108,518.60 are attributable to expenses charged by Holmes Development for works performed by Holmes Development during the period from December 15, 2005 through November 30, 2006 with respect to U.S. Patent # 5,157,489."

expenses for TLC and Watonga, they still may be entitled to deduct the expenses under Lohrke v. Commissioner, 48 T.C. at 688.

Respondent does not dispute that Mr. Cooper was in the trade or business of patent commercialization and being an inventor during the years at issue. Mr. Cooper testified that he had a long-term working relationship with Mr. Holmes. The Holmes Development invoices, while referencing that the services were completed with respect to the 489 patent, also list Mr. Cooper as the obligor and account holder. Thus, it appears Holmes Development understood its client relationship to be with Mr. Cooper individually and not with Watonga or TLC.[38] We find credible Mr. Cooper's testimony that Holmes Development's business relationship was with him personally, Holmes Development trusted Mr. Cooper to pay for the services completed, and that nonpayment of the Holmes Development expenses would have adversely affected Mr. Cooper's business reputation. See, e.g., Jenkins v. Commissioner, T.C. Memo. 1983-667. Furthermore, Holmes

---

[38]The Holmes Development invoices further support our conclusion that Mr. Cooper controlled TLC and his portfolio of patents. See supra p. 31. Although Mr. Cooper purportedly transferred all substantial rights in the 489 patent to TLC and Watonga, Holmes Development understood its relationship to be with Mr. Cooper individually. We do not believe that Holmes Development would have considered its business relationship to be with Mr. Cooper if TLC and Watonga, as applicable, owned all substantial rights in the 489 patent and TLC and Watonga functioned as independent corporations.

Development's work on the 489 patent owned by Watonga had the potential to directly benefit Mr. Cooper's trade or business as an inventor because Mr. Cooper stood to receive 55% of Watonga's net revenue. Accordingly, we conclude that Mr. Cooper's payment of the reverse engineering expenses was for the benefit of his trade or business as an inventor and his ongoing relationship with Holmes Development. Therefore, petitioners have satisfied the first part of Lohrke's two-part test. See Lohrke v. Commissioner, 48 T.C. at 688.

Mr. Cooper further testified that the services performed by Holmes Development were necessary in his trade or business to keep him apprised of current developments and current engineering practices for audio and video technology. He further testified that the services performed by Holmes Development helped him ascertain whether certain products infringed on any patents that he had developed and commercialized. We conclude that the reverse engineering expenses were proximately related to Mr. Cooper's business as an inventor and their payment by him was ordinary and necessary. See id. at 689. Accordingly, we conclude that petitioners have satisfied the second part of the Lohrke test, see id., and they are entitled to deduct the reverse engineering expenses.

IV.    Bad Debt

Section 166 authorizes a taxpayer to deduct any debt that becomes

worthless within the taxable year.  Section 166 distinguishes between business and

nonbusiness bad debts.  Nonbusiness bad debts are treated as losses resulting from

the sale or exchange of a short-term capital asset.[39]  Secs. 166(d)(1), 1211(b),

1212(b).  A nonbusiness debt is a debt other than "(A) a debt created or acquired

(as the case may be) in connection with a trade or business of the taxpayer; or (B)

a debt the loss from the worthlessness of which is incurred in the taxpayer's trade

or business."  Sec. 166(d)(2).  "To qualify for a deduction for a worthless debt a

taxpayer must show that he and his alleged debtor intended to create a debtor-

creditor relationship, that a genuine debt in fact existed, and that the debt became

worthless within the tax year."  Andrew v. Commissioner, 54 T.C. 239, 244-245

(1970); see also sec. 1.166-1(c), Income Tax Regs.  "The year a debt becomes

worthless is fixed by identifiable events that form the basis of reasonable grounds

for abandoning any hope of recovery."  Aston v. Commissioner, 109 T.C. 400, 415

(1997).

---

[39]A business bad debt is deductible as an ordinary loss to the extent of the taxpayer's adjusted basis in the debt.  Sec. 166(b).  Petitioners do not contend that the loan to Pixel is deductible as a business bad debt.

The question of whether a debt became worthless during a taxable year is determined on the basis of all the facts and circumstances. See, e.g., Halliburton Co. v. Commissioner, 93 T.C. 758, 774 (1989), aff'd, 946 F.2d 395 (5th Cir. 1991). "Specifically, * * * [a taxpayer] must prove that the debt had value at the beginning of the taxable year and that it became worthless during that year." Milenbach v. Commissioner, 106 T.C. 184, 204 (1996), aff'd in part, rev'd in part on other grounds, 318 F.3d 924 (9th Cir. 2003). The taxpayer "must show sufficient objective facts from which worthlessness could be concluded; mere belief of worthlessness is not sufficient." Fincher v. Commissioner, 105 T.C. 126, 138 (1995). Furthermore, legal action is not required to show worthlessness if surrounding circumstances indicate that a debt is worthless and uncollectible and that any legal action in all likelihood would be futile because the debtor would not be able to satisfy a favorable judgment. Sec. 1.166-2(b), Income Tax Regs.

A debt is not worthless for purposes of a section 166 deduction merely because it might be difficult, or uncomfortable, to collect. See Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 757 (1998). A creditor's determination that there is no hope of recovery of a debt due and owing must be made in the exercise of sound business judgment and must be based upon information that is

as complete as is reasonably obtainable regarding the debtor's financial condition or ability to satisfy the debt. See Andrew v. Commissioner, 54 T.C. at 248.

An analysis regarding the deductibility of a bad debt must examine whether the debt was truly worthless, and if so, when it became worthless. The conclusions depend on the particular facts and circumstances of the case, and there is no bright-line test or formula for determining worthlessness within a given taxable year. Lucas v. Am. Code Co., 280 U.S. 445, 449 (1930). To be worthless, a debt must not only be lacking current value and be uncollectible at the time the taxpayer takes the deduction, but it must also be lacking potential value due to the likelihood that it will remain uncollectible in the future. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), aff'd, 467 F.2d 47 (9th Cir. 1972); see also Fox v. Commissioner, 50 T.C. 813, 822 (1968) ("Mere belief that a debt is bad is insufficient to support a deduction for worthlessness"). The fact that a business is on the decline, that it has failed to turn a profit, or that its debt obligation may be difficult to collect does not necessarily justify treating the debt obligation as worthless. Intergraph Corp. & Subs. v. Commissioner, 106 T.C. 312, 323 (1996), aff'd without published opinion, 121 F.3d 723 (11th Cir. 1997). This is especially true where the debtor continues to be a going concern with the potential to earn a future profit. See Rendall v. Commissioner, 535 F.3d 1221, 1228 (10th Cir. 2008)

(citing <u>Roth Steel Tube Co. v. Commissioner</u>, 620 F.2d 1176, 1182 (6th Cir. 1980), <u>aff'g</u> 68 T.C. 213 (1977)), <u>aff'g</u> T.C. Memo. 2006-174; <u>ABC Beverage Corp. v. Commissioner</u>, T.C. Memo. 2006-195.

Petitioners contend that the promissory note became worthless in 2008 following the Indian company's abandonment of the Liptracker program. This action, according to petitioners, gave rise to the conclusion that there was no hope of recovering the outstanding amounts under the promissory note. We disagree.

Pixel had total yearend assets each year from 2008 through 2012 in excess of $172,000, including more than $319,000 in assets in 2011 and 2012 . It appears to us that Pixel remained a going concern well past 2008. The outcome of Pixel's arrangement with the Indian company and the failure of the Liptracker program do not support petitioners' claim that there was no longer any prospect of recovery of their loans to Pixel. More importantly, the proper inquiry in this case is not whether petitioners acted reasonably in their recovery efforts, but whether sufficient objective facts show that the debt became worthless during the year in question. Here, the facts do not support such a determination.

Pixel experienced a decline in its business in 2008, but its gross receipts increased in 2009. Petitioners as cotrustees of the Cooper Trust continued to advance funds to Pixel under the terms of the promissory note throughout 2008.

Indeed, petitioners advanced $148,255 to Pixel under the terms of the promissory note between July and December 2008. We do not find it credible that petitioners would have advanced nearly $150,000 to Pixel after July 2008 if they believed the promissory note had been rendered worthless in July 2008 by the difficulties with the Liptracker program.[40] The evidence shows that Pixel had substantial assets at the end of the 2008 tax year and that its gross receipts increased in 2009. Moreover, at the very least, Pixel was entitled to an indefinitely continuing annual royalty of $22,500 and owned rights in several other patents.

Mr. Cooper claimed that he consulted with Mr. Mitchell and they determined that filing a lawsuit against Pixel would be futile. Mr. Cooper then concluded that the promissory note was worthless. But petitioners failed to introduce evidence proving what information Mr. Mitchell analyzed to determine that litigation against Pixel would be futile and failed to introduce evidence proving the basis on which Mr. Mitchell made his purported conclusion. Petitioners have failed to satisfy their burden of proving that no prospect of

---

[40]Generally, advances made to an insolvent debtor are not debts for tax purposes but are characterized as capital contributions or gifts. See Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 497 (1980); Davis v. Commissioner, 69 T.C. 814, 835-836 (1978). Furthermore, advances made by an investor to a closely held or controlled corporation may properly be characterized not as a bona fide loan but as a capital contribution. See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968).

recovery existed in 2008 and failed to prove that the promissory note became worthless in 2008.[41]  See Rule 142(a).  Accordingly, we sustain respondent's disallowance of petitioners' bad debt deduction for 2008.

V.    Accuracy-Related Penalties

A.    Introduction

Section 6662 authorizes the imposition of a 20% penalty on the portion of an underpayment of tax that is attributable to, among other things, (1) negligence or disregard of rules or regulations or (2) any substantial understatement of income tax.  Sec. 6662(a) and (b)(1) and (2).  Only one accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one of the reasons identified in section 6662(b).  Sec. 1.6662-2(c), Income Tax Regs.

The Commissioner bears the initial burden of production with respect to the taxpayer's liability for the section 6662 penalty.  Sec. 7491(c).  The Commissioner must introduce sufficient evidence "indicating that it is appropriate to impose the relevant penalty."  Higbee v. Commissioner, 116 T.C. at 446.  Once the Commissioner meets his burden of production, the taxpayer must come forward

---

[41]Pixel's liabilities to petitioners under the terms of the promissory note comprised substantially all of Pixel's liabilities in 2008.

with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. Id. at 446-447.

B.    Petitioners' Liability for the Section 6662 Penalties

1.    Substantial Understatement of Income Tax

A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). The term "understatement" means the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax imposed that is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). The amount of the understatement is reduced by that portion of the understatement that is attributable to (1) the tax treatment of any item if there is or was substantial authority for such treatment, or (2) any item if the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the taxpayer's treatment of the item. Sec. 6662(d)(2)(B).

Respondent has introduced sufficient evidence to demonstrate that petitioners have substantially understated their income tax liability for each of the years at issue. Petitioners have not alleged nor have they proven that they had

substantial authority for all or any portion of the understatements or that they adequately disclosed their tax positions on their returns. Accordingly, if the Rule 155 computations confirm a substantial understatement, petitioners are liable for the section 6662(a) underpayment penalty for a substantial understatement of income tax.

### 2. Negligence or Disregard of Rules or Regulations

The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. Disregard of rules or regulations "is 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position" and "is 'reckless' if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable

person would observe." Sec. 1.6662-3(b)(2), Income Tax Regs.; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Respondent has met his burden to show that petitioners acted negligently or with careless disregard of rules and regulations with respect to the royalty payments Mr. Cooper received from TLC and with respect to the bad debt deduction for the promissory note. We have found that Mr. Cooper did not transfer all substantial rights to TLC within the meaning of section 1235 because Mr. Cooper indirectly controlled TLC. Further, we have found that the promissory note did not become worthless in 2008 and therefore petitioners were not entitled to claim a bad debt deduction for the promissory note on their 2008 return. Petitioners reported the royalty payments from TLC as capital gain without considering how Mr. Cooper's involvement with TLC affected their qualification for capital gain treatment under section 1235. Similarly, petitioners reported the promissory note as a bad debt on their 2008 return without reasonably attempting to collect the debt and without identifying specific events that made recovery of the debt futile in the future. We conclude that petitioners did not make a reasonable attempt to ascertain the correctness of their bad debt deduction for 2008 or their right to treat the royalty payments received from TLC as capital gain.

C.    Petitioners' Reasonable Cause/Good Faith Defense

Taxpayers may avoid liability for the section 6662 penalty if they demonstrate that they had reasonable cause for the underpayment and that they acted in good faith with respect to the underpayment.  Sec. 6664(c)(1). Reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's efforts to assess his or her proper tax liability.  Id.  Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable."  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). We have previously held that the taxpayer must satisfy a three-prong test to be found to have reasonably relied on professional advice to negate a section 6662(a) accuracy-related penalty:  (1) the adviser was a competent professional who had sufficient experience to justify the reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioners contend that they acted with reasonable cause and good faith based on their reliance on professional advice and therefore no section 6662(a) accuracy-related penalty is applicable. With regard to the royalty payments Mr. Cooper received from TLC, petitioners contend they sought the advice of Mr. Baker, a tax attorney and competent professional. With regard to their bad debt deduction, petitioners contend they sought and relied on the advice of Mr. Baker and Mr. Mitchell. Petitioners contend that they provided Mr. Baker and Mr. Mitchell with all necessary and accurate information, and that they reasonably relied in good faith on Mr. Baker and Mr. Mitchell's advice. See Freytag v. Commissioner, 89 T.C. at 888.

Mr. Baker testified with respect to the royalty payments and petitioners' compliance with section 1235 that he advised petitioners that Mr. Cooper could not indirectly control TLC. Moreover, Mr. Baker did not provide advice to petitioners before they filed their Forms 1040 for the years at issue, nor did he provide advice to petitioners regarding whether Mr. Cooper controlled TLC following TLC's incorporation. Petitioners did not follow Mr. Baker's advice to ensure that Mr. Cooper did not indirectly control TLC. Consequently, petitioners cannot claim reliance on the professional advice of Mr. Baker to negate the section

6662(a) penalty with respect to their erroneous capital gain treatment of the royalty payments Mr. Cooper received during the years at issue.

With regard to the bad debt deduction, petitioners have failed to introduce evidence regarding what information they provided to Mr. Baker and Mr. Mitchell to enable them to determine whether the promissory note was worthless within the meaning of section 166 in 2008. Petitioners did not call Mr. Mitchell to testify or otherwise introduce any evidence regarding Mr. Mitchell's advice. Similarly, Mr. Baker did not testify regarding any advice he may have given to petitioners that would indicate that it was his opinion that the promissory note became worthless in 2008. In short, petitioners have failed to prove that they received or relied on the professional advice of Mr. Baker and Mr. Mitchell with respect to their erroneous section 166 bad debt deduction in 2008.

Because respondent has met his initial burden of production under section 7491(c) with respect to the section 6662(a) penalty for each of the years at issue and petitioners have failed to prove either that they are not liable for the penalties or that they had reasonable cause and acted in good faith, we conclude that respondent properly determined that petitioners are liable for the penalties. Accordingly, if the Rule 155 computations show that the understatement of tax exceeds the greater of 10% of the tax required to be shown on the return or

$5,000, <u>see</u> sec. 6662(d)(1)(A), then petitioners are liable for the section 6662(a) penalty for an underpayment of tax attributable to a substantial understatement of income tax for each of the years at issue.  Alternatively, petitioners are liable for the section 6662(a) penalty for negligence or disregard of rules and regulations with respect to the royalty payments and the section 166 bad debt deduction.

We have considered the remaining arguments made by the parties and, to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the parties' concessions and the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.